UNITED STATES ex rel. LYNN v. HAMILTON et al.

(District Court, W. D. New York. November 4, 1915.)

1. INDIANS ⬥⟹32—FEDERAL GOVERNMENT—AUTHORITY OVER.

Though states have frequently denied the exclusive power of the federal government over Indians living under tribal conditions in reservations within the borders of the state, the federal government has and exercises such power; the federal government alone having made treaties with the Indian tribes before they became weakened.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 4, 52, 53, 57, 58; Dec. Dig. ⬥⟹32.]

2. INDIANS ⬥⟹3—TREATIES—VALIDITY—POWER OF CONGRESS.

Despite early Indian treaties, Congress may govern Indian tribes by direct legislation abrogating or superseding the Indian treaties; the power first being declared by Act March 3, 1871, c. 120, 16 Stat. 566, Rev. St. § 2079 (Comp. St. 1913, § 4034), and subsequently asserted by Act March 3, 1885, c. 341, § 9, 23 Stat. 385, now Criminal Code (Act March 4, 1909, c. 321) § 328, 35 Stat. 1151 (Comp. St. 1913, § 10502), relating to the punishment of Indian offenders.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 5-7, 11; Dec. Dig. ⬥⟹3.]

3. INDIANS ⬥⟹32—STATES—POWERS OF.

As the federal government has exclusive power over Indians living in tribal conditions on reservations within the borders of the state, the states cannot, though Criminal Code, § 328, is quite rudimentary, applying only to the most heinous offenses, extend their own laws to Indians on the theory that, Congress not having completely dealt with the subject, the states might deal with the matter, for, as Congress had exclusive authority, it must be assumed that Congress intended to impose no other restrictions, on the ground of more primitive civilization of the Indians; therefore an Indian living in tribal conditions on a reservation in New York is not liable for a violation of the New York state Conservation Act (Laws 1911, c. 647, as amended by Laws 1913, c. 508) in fishing on the reservation with a net without the required license.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 4, 52, 53, 57, 58; Dec. Dig. ⬥⟹32.]

4. INDIANS ⬥⟹32—TRIBAL ORGANIZATION—GUARDIANSHIP OF FEDERAL GOVERNMENT.

Only the federal government can terminate the tribal organization of Indians living on reservations, and its guardianship over them.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 4, 52, 53, 57, 58; Dec. Dig. ⬥⟹32.]

Habeas Corpus. Petition by the United States of America, on relation of John D. Lynn, for a writ against Frederick W. Hamilton and others. Writ issued, and the defendant Indians charged with violating the New York Conservation Law ordered discharged.

Habeas corpus to inquire into the legality of the arrest and imprisonment of Wilford Kennedy and Nelson Hare, charged with violation of the Conservation Law of the state of New York. Upon the hearing the relator appeared by George P. Decker, Esq., and the respondents by A. F. Jenks, Deputy Attorney General. After hearing oral arguments, the court held the case to enable counsel to prepare and file with the court written briefs on the law questions involved. The

⬥⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Attorney General, having reached the conclusion that the prisoners should be discharged, has prepared the following memorandum to be filed with the other papers herein:

### General Statement.

Wilford Kennedy and Nelson Hare are Indians by blood and members of the Seneca Nation, residing on the Cattaraugus reservation, located in the counties of Erie and Cattaraugus in the state of New York. These Indians were arrested April 21, 1915, by Leon W. Paxon and Albert Stadelmeir, state game protectors, while fishing with a net in Cattaraugus creek and within the boundaries of the Cattaraugus reservation, and were charged with fishing with a net or seine without a license, and in violation of section 176 of the Conservation Law of the state of New York (Laws 1911, c. 647, as amended by Laws 1913, c. 508). While said Indians were being arraigned before Chief Justice William Brennan in the City Court of Buffalo, a writ of habeas corpus was sued out at the instance of the United States government to test the legality of the arrest and imprisonment. The facts, as above outlined are undisputed.

[1] The precise question is whether the Conservation Law of the state of New York extends to Indians maintaining their tribal relations and residing upon an Indian reservation within the limits of the state. The status of Indian tribes and their relation to the federal and state governments have frequently been subjects of judicial investigation. It is necessary to examine somewhat in detail the early history of these tribes and the dealings of the general and state governments with them.

At the time of the formation of the federal government several of the Indian tribes found here were powerful and warlike, and it was found expedient to treat them as possessing some of the attributes of sovereignty, and to deal with them as nations by entering into treaties with them. Later treaties with the Indian tribes were superseded by federal legislation, by which the remnants of the tribes were subjected to the general government and located upon Indian reservations.

It has been the policy of the general government to guarantee to the Indian tribes control over their internal and social affairs, including juisdiction, in certain cases, to punish crimes when committed upon the reservations. This policy was manifested by Congress in the enactment of section 2146 of the Revised Statutes (Comp. St. 1913, § 4149); and for the purpose of their protection, and to allow them to pursue their accustomed life unmolested, Congress, under its constitutional power to regulate commerce with the Indian tribes, passed appropriate legislation forbidding general intercourse between them and the whites.

### I. The attitude of certain states.

Several of the states, however, did not concede that the power granted to the federal government to make treaties and to regulate commerce with the Indian tribes deprived them of jurisdiction over them when residing upon reservations within their borders, and therefore sought by statute to extend their laws over them. Thus in State v. Tassels, Dud. 239, a Georgia case, it was held that Indians were not constitutional objects of the treaty-making power of the United States, but were wards of the state within whose boundaries they were domiciled. In State v. Ta-cha-na-tah, 64 N. C. 614, it was held that the criminal laws of North Carolina extended over the Indian tribes. A similar doctrine was laid down by the Supreme Court of Wisconsin. State v. Doxtater, 47 Wis. 278, 2 N. W. 439; State v. Harris, 47 Wis. 298, 2 N. W. 543. And in New York it was held by the County Court of Cattaraugus County that Indians residing upon reservations within the state were subject to the Forest, Fish and Game Law of the state. People v. Pierce, 18 Misc. Rep. 83, 41 N. Y. Supp. 858.

### II. The federal government has always claimed guardianship and control over the Indian tribes.

It clearly appears from the federal decisions that the Indian tribes, while maintaining their tribal organizations and residing on reservations set apart

for them by, or with the consent of, the general government, have always been regarded as wards of the nation, and not subject to state laws, even when their reservations are located within the borders of a state.

One of the first cases in which the status of Indian tribes was considered by the Supreme Court of the United States is Cherokee Nation v. State of Georgia, 5 Pet. 1, 8 L. Ed. 25. This was a case where the Cherokee Nation moved for an injunction to prevent the enforcement of certain acts of the Legislature of the state of Georgia in the territory of the Cherokee Nation. This tribe claimed the right to proceed in the Supreme Court of the United States as a foreign state against the state of Georgia. The injunction was denied. The court said: *"The condition of the Indians in relation to the United States is, perhaps, unlike that of any two other people in existence. * * * Though the Indians are acknowledged to have an unquestionable, and heretofore unquestioned, right to the lands they occupy, until that right shall be extinguished by a voluntary cession to our government, yet it may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. They may, more correctly, perhaps, be denominated domestic dependent nations. They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession, when their right of possession ceases. Meanwhile, they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian. They look to our government for protection, rely upon its kindness and its power, appeal to it for relief to their wants, and address the President as their great father."*

And so in the case of Worcester v. Georgia, 6 Pet. 515, 8 L. Ed. 483, where the plaintiff had been convicted of the offense of residing in the Cherokee Nation without a license, contrary to a statute of the state of Georgia. The United States Supreme Court set aside the conviction. Chief Justice Marshall in a most able and exhaustive opinion said: "The Cherokee Nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force. * * * The whole intercourse between the United States and this nation is, by our Constitution and laws, vested in the government of the United States."

Later the states of New York and Kansas passed statutes taxing the lands of Indians within their borders, which statutes were upheld by the courts of those respective states. These decisions were both reversed by the United States Supreme Court. In the case of The Kansas Indians, 5 Wall. 755, 18 L. Ed. 667, the court said: "If the tribal organization of the Shawnees is preserved intact, and recognized by the political department of the government as existing, then *they are a 'people distinct from others,'* capable of making treaties, *separated from the jurisdiction of Kansas, and to be governed exclusively by the government of the Union. If under the control of Congress, from necessity there can be no divided authority.* If they have outlived many things, they have not outlived the protection afforded by the Constitution, treaties, and laws of Congress. It may be that they cannot exist much longer as a distinct people in the presence of the civilization of Kansas, *'but until they are clothed with the rights and bound to all the duties of citizens'* they enjoy the privilege of total immunity from state taxation."

The case of The New York Indians, 5 Wall. 761, 18 L. Ed. 708, was decided at the same time.

III. The power of Congress to govern Indian tribes by legislation, and thereby to abrogate or supersede Indian treaties has been upheld by the Supreme Court.

[2] This power was first exercised in 1871. By an act of Congress of March 3d of that year section 2079 was added to the Revised Statutes (Comp. St. 1913, § 4034), as follows: "No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty." Since 1871 Congress has governed the Indian tribes by direct legislation.

For many years Indian tribes residing on reservations were permitted to

have jurisdiction over their internal and social affairs, and were not in this respect interfered with by the federal government. The policy of the government in this respect has been uniform. Later, however, it appeared to Congress that the policy of allowing the tribes to deal with their criminals according to their local customs was not conducive to the best interest of the tribes themselves or the white population surrounding them. Crimes of a more serious nature, committed by one tribal Indian against another, were not dealt with so as to meet the seriousness of the situation.

The necessity for some action on the part of the federal government was forcibly brought to its attention in the case of Ex parte Crow Dog, 109 U. S. 556, 3 Sup. Ct. 396, 27 L. Ed. 1030. In that case the petitioner, a member of the Sioux Nation of Indians, was convicted in the District Court of Dakota for the murder of a member of the same tribe. On appeal to the Supreme Court of the United States the conviction was set aside, for the reason that under section 2146 of the Revised Statutes one Indian committing a crime against another Indian could not be punished in the courts of the United States.

This case gave rise to the passage of section 9 of the Act of Congress of March 3, 1885, now known as section 328 of the United States Criminal Code (Act March 4, 1909, c. 321, 35 Stat. 1151 [Comp. St. 1913, § 10502]). That act provides: "*All Indians* committing against the person or property of another Indian or other person any of the following crimes, namely, murder, manslaughter, rape, assault with intent to kill, arson, burglary and larceny, within any territory of the United States, and either within or without an Indian Reservation, shall be subject therefor to the laws of said Territory relating to said crimes, and shall be tried therefor in the same courts and in the same manner and shall be subject to the same penalties as are all other persons charged with the commission of said crimes, respectively; and the said courts are hereby given jurisdiction in all such cases; *and all such Indians* committing any of the above crimes against the person or property of another Indian or other person *within the boundaries of any state of the United States, and within the limits of an Indian Reservation, shall* be subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States." This enactment specifically vested the federal courts with exclusive jurisdiction of the crimes therein mentioned, even when committed upon reservations wholly within the states.

The constitutionality of this act was immediately tested in the United States Supreme Court in the case of United States v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228. The question arose upon a demurrer to an indictment against two Indians for the murder of another Indian on the Hoopa Valley reservation in the state of California. The defendant in error contended that the act was unconstitutional as being an invasion of state rights. The court held the act *to be constitutional.* In this case the status of tribal Indians in their relation to the federal and state governments is completely developed and defined in plain and unmistakable language.

In the learned opinion delivered by Mr. Justice Miller, upholding the constitutionality of the statute, he says: "It seems to us that this [meaning the act of 1885, above referred to] is within the competency of Congress. These Indian tribes are *the wards of the Nation.* They are communities dependent on the United States; dependent largely for their daily food; dependent for their political rights. They owe *no allegiance to the states,* and receive from them no protection. Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the federal government * * * and the treaties in which it has been promised, *there arises the duty of protection, and with it the power.* This has always been recognized by the executive, and by Congress, and by this court, whenever the question has arisen." In concluding his opinion he says: "The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, *is necessary to their protection,* as well as to the safety of those among whom they dwell. *It must exist in that government, because it never has existed anywhere else,* because

the theater of its existence is within the geographical limits of the United States, and because it has never been denied, and because *it* alone can enforce its laws on *all* the tribes."

The opinion also makes it clear that the decision is not placed upon the ground of the constitutional grant of power to regulate commerce with the Indian tribes, but upon the broad ground that the federal government, because of its peculiar relationship to the Indian tribes, is bound to assume exclusive control over them. This case has been repeatedly cited with approval by the United States Supreme Court in recent decisions, and the policy of the federal government therein laid down has been strictly followed.

In the case of Cusick v. Daly, 212 N. Y. 183, 105 N. E. 1048, the Court of Appeals followed the Kagama Case. It was contended in that case that there was a distinction between Indian tribes whose reservations are the direct gift of the federal government and those whose reservations are derived from a state or from other sources. Judge Werner, writing for the court in this connection, said : "We find no such distinction in the statute, and we can think of none that logically differentiates one from the other."

IV. The principle that a state may act in the absence of affirmative legislation on the part of Congress is not applicable to the government of tribal Indians.

[3, 4] It might be claimed that a state may exert its authority over tribal Indians, except as to those major crimes specifically mentioned in section 328 of the United States Criminal Code, on the theory that, there being no express inhibition against the state. Congress by inaction has tacitly authorized it so to act. This is a doctrine well recognized and often applied to cases which involve questions of interstate commerce, and even to other matters. It is predicated upon the theory that where the states have original jurisdiction over a subject, but, by adopting the federal Constitution, granted to the federal government power to deal with that subject, the jurisdiction of Congress is not exclusive until Congress has, by appropriate legislation, exercised its power.

This doctrine was applied in the case of Manchester v. Massachusetts, 139 U. S. 240, 11 Sup. Ct. 559, 35 L. Ed. 159, where the Supreme Court upheld the right of the state, in the absence of federal legislation upon the subject, to control the menhaden fisheries in Buzzards Bay, a place concededly within the admiralty and maritime jurisdiction of the United States. It has never been applied to matters which, from necessity, rest exclusively with the federal government—for example, the power to coin money, establish post offices, declare war, etc. The application of this principle to the government of Indian tribes has never found support in the decisions of the courts, but the doctrine was alluded to in the opinion of Judge Werner in the Daly Case, supra. No support for such a contention can be found in the opinion of Mr. Justice Miller in the Kagama Case. *If the Indian tribes are wards of the federal government and owe no allegiance to any state, and if the power over the Indian tribes rests with the federal government because it exists nowhere else, and if from necessity there can be no divided authority, then the jurisdiction of Congress must be exclusive.*

V. Federal and state authorities hold that state laws do not apply to Indians living in their tribal relations.

In the case of In re Blackbird (D. C.) 109 Fed. 139, where an attempt was made to punish a tribal Indian for a violation of the game laws of the state of Wisconsin, Judge Bunn, of the United States District Court, after fully reviewing the Kagama Case, said: "This case should and does settle the question by the highest authority that, Congress having taken jurisdiction of crimes committed by Indians within the limits of an Indian reservation, that jurisdiction *is exclusive, and that the state laws do not extend to these cases.*"

The doctrine is well enunciated in the case of State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169, where an attempt was made to punish a tribal Indian for committing adultery. Judge Mitchell, speaking for the court, said : *"It would never do to have both the United States and the state legislating on the same subject.* By the act of 1885, presumably, Congress

has enumerated all the acts which in their judgment ought to be made crimes when committed by Indians, in view of their imperfect civilization. For the state to be allowed to supplement this by making every act a crime on their part which would be such if committed by a member of our more highly civilized society would be not only inappropriate, but also practically to arrogate the guardianship over these Indians which is *exclusively vested in the general government.*"

In the case of Peters v. Malin (C. C.) 111 Fed. 244, was involved the question whether the plaintiff, a tribal Indian, had violated a statute of the state of Iowa. It was there held that "so long as these Indians retain their tribal relation and continue to be wards of the national government, the *control* and *management* of them with respect to their tribal affairs is in the federal government, irrespective of the question of the title of the lands upon which for the time being they may be located." In this opinion Judge Shiras advances a most cogent reason for upholding the exclusive jurisdiction of the federal government when he says: "It is apparent that, if the various provisions of the laws of Iowa are to be held applicable to these Indians and their property, *then their tribal condition will be speedily broken up, not in pursuance of the acts of the national government,* but through the enforcement of the laws of the state. * * *" And further on in his opinion he adds: "Although these Indians reside within the territorial limits of the state of Iowa, they are, so far as their ordinary life is concerned, *without the plane of the legislative jurisdiction of the state.*"

VI. Power to terminate federal guardianship of tribal Indians and to break up the tribal organization is exclusively in the federal government.

From the more recent enactments of Congress, relative to Indian allotments, it is apparent that a new policy looking towards the breaking up of the tribal relations, freeing them from the national guardianship, and charging them with the duties and obligations of citizens is being inaugurated. Congress has this power, and may abandon its guardianship at any time. The states, however, have no power to disintegrate tribal relations by extending state laws over tribal Indians. As was said in the case of Matter of Heff, 197 U. S. 499, 25 Sup. Ct. 508, 49 L. Ed. 848: "It is for Congress to determine when and how the relationship of guardianship shall be abandoned. It is not within the power of the courts to overrule the judgment of Congress."

VII. Conservation laws do not extend over the Indians residing in tribal relations upon reservations within the borders of New York state.

Accepting as the law of the land the principles laid down by the courts of the United States as to the status of the tribal Indians within its borders, there seems to be no escape from the conclusion that the Conservation Law of the state of New York does not apply to tribal Indians residing on their reservations within the territorial limits of the state.

HAZEL, District Judge. The petition recites the arrest and imprisonment of Wilford Kennedy and Nelson Hare, tribal Indians of the Seneca Nation living on the Cattaraugus Reservation, for violation of the Conservation Law of the state of New York, in that on April 21, 1915, they were fishing with a net in Cattaraugus creek, within the boundaries of the Cattaraugus Indian reservation, in violation of section 176 of said law. The Indians were arrested by state game protectors, and arraigned before Judge William Brennan at Buffalo, whereupon a writ of habeas corpus was granted at the instance of the United States attorney to test the legality of the arrest and imprisonment. The case was ably argued before me at the Rochester term of court by A. F. Jenks, Esq., Deputy Attorney General, appearing for the state of New York, and by George P. Decker, Esq., appearing as counsel for the United States, and time for filing briefs was allowed. The Deputy Attorney General maintained that the state

of New York had jurisdiction over tribal Indians for violations of the Conservation Law on their reservations, but recently I have received from him an admirable opinion, based on an examination by him of the authorities bearing upon the disputed question of jurisdiction, in which he reaches the conclusion that the position of the United States government was right, and that the New York state Conservation Law does not apply to tribal Indians living on reservations within the territorial limits of the state. I adopt such opinion, which is filed herewith, and concur in the conclusions therein reached.

An order may be entered allowing the writ and discharging the defendants.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes