524 P.2d 187

John George MAHONEY, Plaintiff, and Margaret Rose Mahoney, Plaintiff and Respondent,

v.

STATE of Idaho, State TAX COMMISSION, Defendant and Appellant.

No. 11016.

Supreme Court of Idaho.

Sept. 5, 1973.

On Rehearing July 8, 1974.

**60**

W. Anthony Park, Atty. Gen., Robert L. Miller, Deputy Atty. Gen., Boise, for defendant and appellant.

McFadden & Park, St. Maries, Hamilton & Hamilton, Coeur d'Alene, for plaintiff and appellee.

Robert D. Dellwo, Spokane, Wash., amicus curiae.

DONALDSON, Chief Justice.

The original plaintiff in this action was John George Mahoney, who sought to recover 784 cartons of cigarettes seized by the defendant-appellant Idaho State Tax Commission and to restrain the Commission fron interfering with the plaintiff's cigarette-vending business. Subsequent to the filing of this action, the respondent Margaret Rose Mahoney acquired all interests in the confiscated property and was, therefore, substituted as plaintiff for John George Mahoney, as to whom the action was dismissed.

The respondent and her predecessor in interest are both members of the Coeur d'Alene Indian Tribe. On June 21, 1968, an agent of the Tax Commission seized the respondent's cigarettes because they did not bear Idaho cigarette tax stamps. At the time of the seizure, the cigarettes were located at the respondent's on-reservation tobacco shop and were being held for sale to both Indian and non-Indian purchasers. A substantial portion of the respondent's sales were made to non-Indian members of the general public. The cigarettes seized by the State were purchased by the respondent in Spokane, Washington, and trans-

ported to the reservation in the respondent's personal automobile.

The respondent's concession is located one mile north of Plummer, Idaho, just off U.S. Highway 95, a major north-south route through this state, carrying a large volume of daily traffic. The respondent's business is a private enterprise in no way connected with tribal business, and its owner is not engaged in performing a tribal function.

Since the cigarettes seized by the Commission were perishable, the parties agreed that they should be sold and that the proceeds of sale ($1,484.15) should be held pending the outcome of the action.

Section 63–2503 of the Idaho Code provides that "[t]here is hereby levied, and there shall be collected as hereinafter provided, a tax upon *the retail sale of cigarettes*." Emphasis added. As amended in 1972, this section currently imposes this sales tax at the rate of $\%_{20}$ of 1¢ per cigarette, or 90¢ per standard carton of 200 cigarettes. If the respondent's sales are exempt from this tax, she would obviously have a 90¢-per-carton competitive advantage over vendors not located on Indian land.

The district court held that Idaho lacks jurisdiction to tax the on-reservation sale of cigarettes by Indians. Judgment was entered in favor of the respondent Indian for $1,484.15, plus interest and costs; in addition, the court permanently enjoined the Tax Commission from interfering with the operation of the respondent's business.

On appeal, the Tax Commission asserts that the cigarettes were seized only because they were being held *for sale to non-Indians*. The appellant disclaims any right to tax on-reservation sales by Indians to Indians. Nor does the appellant challenge the district court's finding that the Coeur d'Alene Indian Tribe has never entered into any agreement consenting to the taxation of its members by the State of Idaho.

### I.

During the pendency of this appeal, the Supreme Court of the United States vacated the judgment of the Washington Supreme Court in Tonasket v. State, 79 Wash.2d 607, 488 P.2d 281 (1971), relied upon by the appellant herein. Tonasket v. Washington, 411 U.S. 951, 93 S.Ct. 1941, 36 L.Ed.2d 385 (1973) (per curiam). In its decision in the case, the Washington Supreme Court held that the Washington cigarette tax could be applied to the on-reservation sale of cigarettes by an Indian, most of whose customers were non-Indians.[1] In vacating the Washington judgment, the Supreme Court of the United States ordered the Supreme Court of Washington to reconsider its decision in light of the former's recent unanimous decision in McClanahan v. State Tax Commission of Arizona, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). The Supreme Court of the United States thereby indicated that the principles enunciated in *McClanahan* are applicable in cases such as this involving a state's attempt to tax

---

1. The Washington Court distinguished Warren Trading Post Co. v. Arizona State Tax Comm'n, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965) (invalidating a state gross sales tax as applied to sales made to reservation Indians by federally licensed Indian traders), on three grounds, saying that the third was the most significant: (1) Tonasket had no federal license; (2) the bulk of his trade was with non-Indians; and (3) his tribe had submitted itself to the jurisdiction of the state, and the state had assumed such jurisdiction, as permitted by federal law. The 1953 Act enabling certain states to unilaterally assume jurisdiction in Indian country (Public Law 280, 67 Stat. 588, § 7) was repealed by the 1968 Civil Rights Act (Public Law 90–284, 82 Stat. 79, Title IV, § 403(b)), but the 1968 Act specifically provides that "such repeal shall not affect any cession of jurisdiction made pursuant to such section prior to its repeal." 25 U.S.C.A. § 1323(b); Boyer v. Shoshone-Bannock Indian Tribes, 92 Idaho 257, 261, 441 P.2d 167 (1968). A state may now assume jurisdiction over reservation Indians only "with the consent of the tribe occupying the particular Indian country." 25 U.S.C.A. §§ 1321(a), 1322(a). See McClanahan v. State Tax Comm'n of Arizona, 411 U.S. 164, 93 S.Ct. 1257, 1265, 36 L.Ed. 2d 129 (1973).

on-reservation sales consummated by Indian sellers, even though *McClanahan* itself involved a state's attempt to tax personal *income* earned by an Indian solely from reservation sources.

The holding of the Court in *McClanahan* is perhaps best described by the Supreme Court itself in Mescalero Apache Tribe v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 115 (1973), released the same day as *McClanahan*:

> "[I]n the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, and McClanahan v. State Tax Commission of Arizona, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129, lays to rest any doubt in this respect by holding that such taxation is not permissible absent congressional consent."

## II.

◼ The federal government's authority over Indian matters derives from the Federal Constitution's delegation to it of responsibility for regulating commerce with Indian tribes and for making treaties. McClanahan v. State Tax Comm'n of Arizona, *supra*, 411 U.S. 164, 93 S.Ct. at 1262 n. 7, 36 L.Ed.2d 129; U.S.Const. Art. I, § 8, cl. 3; Art. II, § 2, cl. 2. Under Article I, section 8, clause 3 of the United States Constitution, the Congress has the power "[t]o regulate commerce with foreign Nations, and among the several States, *and with the Indian Tribes.*" Emphasis added.

◼ It is beyond dispute that the Commerce Clause would preclude the imposition of Idaho *sales* tax upon sales which are consummated in a sister state. Evco v. Jones, 409 U.S. 91, 93 S.Ct. 349, 34 L.Ed.2d 325 (1972) (per curiam); McLeod v. J. E. Dilworth Co., 322 U.S. 327, 64 S.Ct. 1023, 88 L.Ed. 1304 (1944). For Idaho to impose a tax on such transactions "would

be to project its powers beyond its boundaries and to tax an interstate transaction." McLeod v. J. E. Dilworth Co., *supra*, 322 U.S. at 330, 64 S.Ct. at 1025. As the United States Supreme Court went on to say in McLeod:

> "[A] tax on an interstate sale like the one before us [unlike a use tax] involves an assumption of power by a State which the Commerce Clause was meant to end. The very purpose of the Commerce Clause was to create an area of free trade among the several States. That clause vested the power of taxing a transaction forming an unbroken process of interstate commerce in the Congress, not in the States." 322 U.S. at 330–331, 64 S.Ct. at 1026.

Of course, the *McLeod* case dealt with commerce "among the several states"; but by its own terms, the Commerce Clause applies with equal force to commerce "with the Indian tribes." It follows, therefore, that the Commerce Clause precludes the imposition of Idaho sales tax upon the on-reservation sale of cigarettes by members of an Indian tribe to non-Indian purchasers. *See* McClanahan v. State Tax Comm'n of Arizona, *supra.*

The tax levied upon the respondent by Idaho is characterized by the operative statute itself as "a tax upon the retail sale of cigarettes." I.C. § 63–2503. In this case, the state is attempting to tax sales occurring within the boundaries of an Indian reservation, not sales occurring within Idaho's domain. Idaho Organic Act, § 1; Idaho Const. Art. 21, § 19 ("Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States.") *Compare* Worcester v. Georgia, 31 U.S. 515, 560–561, 6 Pet. 515, 8 L.Ed. 483 (1832) *and* Boyer v. Shoshone-Bannock Indian Tribes, 92 Idaho 257, 441 P.2d 167 (1968) *with* McGoldrick v. Berwind-White Coal Mining Co., 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565 (1940). To paraphrase *McLeod*, a tax on sales made by Indians on Indian reservations involves an assumption of power by a state which the Commerce Clause was meant to end. That

clause vested in Congress, not in the states, the power of taxing a transaction forming an unbroken process of commerce with the Indian tribes. McLeod v. J. E. Dilworth Co., *supra*. Here, as in *McClanahan*, the tax imposed may be successfully resisted because "the State is totally lacking in jurisdiction." 411 U.S. at 181, 93 S.Ct. at 1267.

▮ The appellant tax commission argues, somewhat weakly, that it can collect cigarette tax from the respondent because her cigarettes became subject to the state's taxing jurisdiction when they passed through non-reservation Idaho territory while in transit to the respondent's place of business on the reservation. This argument is based upon I.C. § 63–2501, which in pertinent part provides:

> "It is the intent and purpose of this act to levy a tax *on all cigarettes* sold, used, consumed, *handled* or distributed within this state, and to collect the tax from the person who first sells, uses, consumes, handles, or distributes the cigarettes." Emphasis added.

We may assume *arguendo*, without deciding, that I.C. § 63–2501 is effective to make the handling of cigarettes an incidence of taxation, despite the more specific language of I.C. § 63–2503—i. e., "there is hereby levied, and there shall be collected as hereinafter provided, a tax *upon the retail sale of cigarettes*" (emphasis added). The appellant's contention still must fail, for two reasons: First, as the respondent correctly points out, nothing in the record affirmatively indicates that the respondent's cigarettes ever passed through non-reservation Idaho territory. We may take judicial notice of the geographical facts that the western boundary of the Coeur d'Alene Indian reservation is contiguous to Washington's eastern border, and there are roads going from the vicinity of Spokane directly onto the reservation. Idaho Dep't of Highways, 1973 Official Highway Map; *see* I.C. § 9–101, subd. 8. Therefore, it is not only possible but quite probable that the cigarettes in question traveled from Spokane to the respondent's place of business on the reservation without ever passing through non-reservation Idaho territory. Second, it is elementary hornbook law that "the states may not tax property in transit in interstate commerce." Minnesota v. Blasius, 290 U.S. 1, 9, 54 S.Ct. 34, 36, 78 L.Ed. 131 (1933). Thus, for example, Arkansas has no authority to tax cigarettes in transit from Missouri to Texas. Pfeiffer v. State, 226 Ark. 825, 295 S.W.2d 365 (1956) (excise tax); *see* Annot., 46 A.L.R.3d 1342, 1352 (1972). It would seem to follow that a state may not tax goods in transit from a sister state to reservation Indians. U.S.Const. Art. I, § 8, cl. 3.

Also relied upon by the appellant is Makah Indian Tribe v. Tax Comm'n, 72 Wash.2d 613, 434 P.2d 580 (Wash.1967), appeal dismissed for want of a substantial federal question, 393 U.S. 8, 89 S.Ct. 44, 21 L.Ed.2d 8 (1968) (mem.), in which the Washington Supreme Court rejected a Commerce Clause challenge and held that Washington could collect its cigarette tax from off-reservation, non-Indian wholesalers who supply their products to retail outlets doing business on a reservation. The facts of that case distinguish it from the case at bar. As the Washington court itself indicated:

> "It is noted that, in its practical application, the Washington cigarette tax applies to and is paid by the wholesalers who distribute the cigarettes to retail outlets for resale. At the time the tax is paid and the tax stamps evidencing payment are affixed to a package, *the cigarettes are the inventory of non-Indian wholesalers conducting their business activities wholly outside of any Indian reservation*; the cigarettes have neither been specifically identified as those to be sold on an Indian reservation nor as those to be sold at retail to Indians.

> \* \* \* \* \* \*

> "[T]he tax here involved does not represent state legislation 'on the subject' of Indian trading, but rather upon the subject of the wholesale distribution ac-

*tivities carried on wholly outside of any Indian reservation.*

\*     \*     \*     \*     \*     \*

"Neither the plaintiff Tribe nor any of its members are cigarette wholesalers. *The tax on cigarettes is not collected by the State of Washington from the Makah Tribe or from any members of that Tribe. It is collected only from wholesalers and distributors as a result of their doing business outside the boundaries of any Indian reservation.*

" \* \* \* [T]he incidence of the tax occurred *outside of any Indian reservation and prior to the entry of the cigarettes into Indian commerce."* 72 Wash.2d at 614, 434 P.2d at 581–582 (emphasis added).

In the case before us today, the incidence of the tax falls squarely upon sales by an Indian on a reservation; this tax is nothing less than a direct tax upon commerce with the Indian tribes, and "such taxation is not permissible absent congressional consent." Mescalero Apache Tribe v. Jones, *supra* at 1270 of 93 S.Ct. (summarizing the holding of McClanahan v. State Tax Comm'n of Arizona, *supra*).

### III.

The case at bar is not, moreover, merely one in which congressional consent is absent; rather, it is one in which congressional denial of the power asserted is manifest. In passing the Buck Act, now 4 U.S.C.A. §§ 105–110, Congress in effect stated its intention to maintain the existing tax exempt status of sales made by reservation Indians. The Buck Act permits states to levy sales, use, or income taxes within any federal area (meaning "any lands or premises held or acquired by or for the use of the United States or any department, establishment, or agency of the United States," 4 U.S.C.A. § 110(e)). But the Buck Act also expressly provides that: "Nothing [herein] shall be deemed to authorize the levy or collection of any tax on or from any Indian not otherwise taxed." 4 U.S.C.A. § 109. The Buck Act was ap-

proved by the Senate on September 30, 1940, and by the House on October 1, 1940. When Congress excepted Indians "not otherwise taxed," it must have been aware of two opinions released by the Solicitor of the Interior Department earlier in 1940. In an opinion of May 8, 1940, the Solicitor held:

"Traders on Indian reservations who are non-Indians \* \* \* must account to the State authorities for sales taxes on so much of their business as is done with non-Indians. They are not required to account to the State authorities for their transactions with Indians on the reservations, but are, if they do deal with the Indians, required to conform with the licensing provisions in the Federal statutes regulating trade with Indians. *Traders who are themselves Indians are not subject to the State laws whether they deal with Indians or non-Indians.*

\* \* \* Where traders are not located on Indian reservations they are, in my opinion, responsible for the State taxes and subject to license whether or not they are Indians and whether or not they deal with Indians." 57 I.D. 124, 126 (1940) (emphasis added), overruled in part as to another holding, 58 I.D. 562, 567 (1943), cited with approval in Warren Trading Post Co. v. Arizona Tax Comm'n, 380 U.S. 685, 690, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), *and in* 58 I.D. 562, 563.

Later in May 1940, in an opinion of obvious relevance to the case at bar, the Solicitor ruled that a state tax on the selling of tobacco products could not be applied to the selling of such products by the commissary of the Menominee Indian Mills to employees and the general public. Said the Solicitor:

"III.   Application of State Sales Tax on Tobacco Products

"The Wisconsin laws of 1939 (chs. 433, 518) place an occupational tax on the sale or other disposition of tobacco products except in the case of sales 'for shipment in interstate or foreign com-

merce.' Manufacturers and wholesalers are required to pay the tax by purchasing and affixing State stamps on the tobacco products. The statute makes it unlawful for other than registered salesmen to sell tobacco products in the State or to purchase such products from other than licensed wholesalers. Under this law the State authorities claim from the Menominee Indian Mills several hundred dollars in taxes based on the inventory of tobacco products on hand in the mills' commissary as of the date of the passage of the act.

\*  \*  \*  \*  \*  \*

"(2) The application of this tax to the Menominee Indian Mills would constitute a regulation of trade with the Indians which is beyond the power of the State. Commerce with Indian tribes might have been included in the exceptions provided in the State law along with the exception of sales in interstate and foreign commerce, since all three such types of commerce are placed by the Constitution under the regulatory power of Congress. In my memorandum of February 4, 1938, *supra,* holding that State sales taxes did not apply to purchases made by or from Indians on Indian reservations, I referred to the fact that it was well established that Indians are not amenable to State laws while on their reservations unless expressly subjected to those laws by Congress. The Kansas Indians, 5 Wall. 737, 755, 756 [18 L.Ed. 667]; United States v. Kagama, 118 U.S. 375 [6 S.Ct. 1109, 30 L.Ed. 228]; United States v. Rickert, 188 U.S. 432 [23 S.Ct. 478, 47 L.Ed. 532]; United States v. Quiver, 241 U.S. 602 [36 S.Ct. 699, 60 L.Ed. 1196]; United States v. Hamilton, 233 F. 685; In re Blackbird, 109 F. 139; In re Lincoln, 129 F. 247; State v. Rufus, 237 N.W. 67.

\*  \*  \*  \*  \*  \*

"3 The Menominee Indian Mills are not liable for the State tax placed on tobacco products, where tobacco products are sold through the commissary of the mills, whether the products are sold to Indians or to other persons." 57 I.D. 129, 140–141 (1940).

With these opinions fresh in mind, Congress expressly chose to exclude reservation Indians from the purview of the Buck Act. 4 U.S.C.A. § 109; McClanahan v. State Tax Comm'n of Arizona, *supra*; Warren Trading Post Co. v. Arizona State Tax Comm'n, 380 U.S. 685, 691 n. 18, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965). As stated in a Solicitors opinion released three years after Congress passed the Buck Act:

"That act, however, contains no indication of any intent on the part of Congress to interfere with the regulation by the Commissioner of Indian Affairs of trade with the Indians on Indian reservations or to burden the Indians with a tax to which they could not then legally be subjected. On the contrary, section 5 of the act declares that the permission given to the States shall not 'be deemed to authorize the levy or collection of any tax on or from any Indian not otherwise taxed.' While this declaration is somewhat awkwardly phrased the meaning is plain. Basic Indian immunities under the law in force prior to the enactment were not to be disturbed nor were new immunities to be created. The legality of State taxes on sales to Indians thus is to be determined not by but independently of the provisions of the act of October 9, 1940. Under this view, the opinion of May 8, 1940, is correct \* \* \*." 58 I.D. 562, 563 (Dec. 24, 1943). *See generally* The Department of the Interior's Federal Indian Law 867–873 (1958) (Oceana Publications ed. 1966).

What the Supreme Court said about Arizona's income tax in *McClanahan* is equally appropriate here:

"Indeed, Congress' intent to maintain the tax exempt status of reservation Indians is especially clear in light of the Buck Act, 4 U.S.C. § 104 et seq., which provides comprehensive federal guidan for state taxation of those living wi federal areas. Section 106(a) of Ti grants to the States general authc

impose an income tax on residents of federal areas, but § 109 expressly provides that 'Nothing in sections 105 and 106 of this title shall be deemed to authorize the levy or collection of any tax on or from any Indian not otherwise taxed.' To be sure, the language of the statute itself does not make clear whether the reference to 'any Indian not otherwise taxed' was intended to apply to reservation Indians earning their income on the reservation. But the legislative history makes plain that this proviso was meant to except reservation Indians from coverage of the Buck Act, see S. Rep.No.1625, 76th Cong., 3d Sess., 2, 4; 84 Cong.Rec. 10685 (1939), and this Court has so interpreted it. See Warren Trading Post Co. v. Arizona Tax Commission, 380 U.S. 685, 691, 85 S.Ct. 1242, 1245, 14 L.Ed.2d 165 n. 18 (1965). While the Buck Act itself cannot be read as an affirmative grant of tax exempt status to reservation Indians, it should be obvious that Congress would not have jealously protected the immunity of reservation Indians from state income taxes had it thought that the States had residual power to impose such taxes in any event. Similarly, narrower statutes authorizing States to assert tax jurisdiction over reservations in special situations are explicable only if Congress assumed that the States lacked the power to impose the taxes without special authorization." McClanahan v. State Tax Comm'n of Arizona, *supra*, 411 U.S. at 176–177, 93 S.Ct. at 1264–1265.

## IV.

Here, as in *McClanahan,* the Tax Commission contends that since it has only attempted to tax an individual Indian and not the tribe or reservation as such, its ef-

forts must be sustained because tribal self-government has not been infringed.[2] And, relying upon the Arizona appellate court's decision in *McClanahan,* the state further contends that it is irrelevant whether its tax infringes upon the respondent's rights as an individual Indian. The response of the Supreme Court to these contentions is instructive:

"In fact, we are far from convinced that when a State imposes taxes upon reservation members without their consent, its action can be reconciled with tribal self-determination. But even if the State's premise is accepted, we reject the suggestion that the *Williams* test [3] was meant to apply in this situation. It must be remembered that cases applying the *Williams* test have dealt principally with situations involving non-Indians. See also Organized Village of Kake v. Egan, 369 U.S. 60, 75–76, 82 S. Ct. 562, 570–571, 7 L.Ed.2d 573 (1962). In these situations, both the Tribe and the State could fairly claim an interest in asserting their respective jurisdictions. The *Williams* test was designed to resolve this conflict by providing that the State could protect its interest up to the point where tribal self-government would be affected.

"The problem posed by this case is completely different. Since appellant is an Indian and since her income is derived wholly from reservation sources, her activity is totally within the sphere which the relevant treaties and statutes leave for the Federal Government and for the Indians themselves. Appellee cites us to no cases holding that this legislation may be ignored simply because tribal self-government has not been infringed. On the contrary, this Court ex-

2. In support of this contention, the appellant relies upon cases such as Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), which state that the test for determining the validity of state action is "whether [it] infringed on the right of reservation [Indians] to make their own laws and be ruled [by th]em." 358 U.S. at 220, 79 S.Ct. at 271.

In that portion of the *McClanahan* opinion hereinafter quoted in the text of this opinion, the Supreme Court apparently limits the applicability of the *Williams* test to cases involving *non-Indians.*

3. See note 2, *supra.*

pressly rejected such a position only two years ago. In Kennerly v. District Court, 400 U.S. 423, 91 S.Ct. 480, 27 L. Ed.2d 507 (1971), the Blackfeet Indian Tribe had voted to make state jurisdiction concurrent within the reservation. Although the State had not complied with the procedural prerequisites for the assumption of jurisdiction, it argued that it was nonetheless entitled to extend its laws to the reservation since such action was obviously consistent with the wishes of the Tribe and, therefore, with tribal self-government. But we held that the *Williams* rule was inapplicable and that '[t]he unilateral action of the Tribal Council was insufficient to vest Montana with jurisdiction.' 400 U.S. at 427, 91 S.Ct. at 482. If Montana may not assume jurisdiction over the Blackfeet by simple legislation even when the Tribe itself agrees to be bound by state law, it surely follows that Arizona may not assume such jurisdiction in the absence of tribal agreement.

\*   \*   \*   \*   \*   \*

"Finally, we cannot accept the notion that it is irrelevant 'whether the . . . state income tax infringes on [appellant's] rights as an individual Navajo Indian,' as the State Court of Appeals maintained. McClanahan v. State Tax Commission, 14 Ariz.App. 452, 454, 484 P.2d 221, 223 (1970). To be sure, when Congress has legislated on Indian Matters, it has, most often, dealt with the tribes as collective entities. But those entities are, after all, composed of individual Indians, and the legislation confers individual rights. This Court has therefore held that 'the question has always been whether the state action infringed on the right of *reservation Indians* to make their own laws and be ruled by them.' Williams v. Lee, *supra,* at 220 of 358 U.S., at 271 of 79 S.Ct. (emphasis added). In this case, appellant's rights as a reservation Indian were violated when the state collected a tax from her which it had no jurisdiction to impose." McClanahan v. State Tax Comm'n of

Arizona, *supra,* 411 U.S. at 179–180, 93 S.Ct. at 1266–1267.

In the absence of congressional consent, the Idaho State Tax Commission had no jurisdiction to tax the on-reservation sale of cigarettes by an Indian seller, whether the purchasers were Indians or non-Indians. U.S.Const. Art. I, § 8, cl. 3. Where, as here, Congress has manifested its intent to deny the states the power to collect such a tax, it is irrelevant that its imposition would not infringe upon tribal self-government. McClanahan v. State Tax Comm'n of Arizona, *supra.* The decision of the district court is correct and accordingly must be affirmed.

Judgment affirmed. Costs to respondent.

McQUADE and McFADDEN, JJ., concur.

SHEPARD, Justice (dissenting).

I respectfully dissent. The majority discusses at length the State's ability to collect a sales tax upon goods sold by an Indian. In the case at bar, however, the plaintiff protests the State's seizure of 784 cartons of cigarettes. Apparently, the cigarettes lacked Idaho tax stamps.

In Tonasket v. State, 79 Wash.2d 607, 488 P.2d 281 (1971) the Washington Court was faced with an almost identical situation. In *Tonasket* the state also seized cigarettes not bearing the Washington tax stamp and charged the Indian owner with a criminal violation. The Washington Court, after extensively reviewing the pertinent state and federal statutes and the decisions of the United States Supreme Court, sustained the position of the State of Washington. On appeal the Supreme Court of the United States did not reverse the decision of the Washington Supreme Court. Instead, the Supreme Court vacated the judgment so the Washington Court could consider the effect of McClanahan v. State Tax Commission of Arizona, 411 U. S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

The majority opinion herein suggests the Supreme Court of the United States "thereby indicated that the *principles* enunciated in *McClanahan* are applicable in cases such as this * * *." I respectfully disagree.

Certainly, the opinion of the Supreme Court of Washington in *Tonasket* is not binding on this Court. Nevertheless, I find it well-reasoned, scholarly and highly persuasive. In my judgment the cavalier treatment of *Tonasket* by the United States Supreme Court only muddies further the troubled waters surrounding state jurisdiction over Indians. The Court's opinion in Mescalero Apache Tribe v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 115 (1973) further compounds this confusion. *Mescalero* was issued the same day as *McClanahan.*

The Washington Supreme Court in *Tonasket* notes recent federal legislation enabling states to assume certain jurisdiction over Indians and Indian lands. The State of Washington did assume such jurisdiction. In *McClanahan* the Court founded its opinion almost entirely on the supposed fact that Arizona had not assumed such jurisdiction. As a result of *McClanahan* and *Mescalero* and the lack of guidance offered by *Tonasket,* the courts are left to their own resources in grappling with the mind-boggling distinction between *Mescalero* and *McClanahan.* The Court in *McClanahan* stated:

"We are far from convinced that when a State imposes taxes upon reservation members without their consent, *its action can be reconciled with tribal self-determination.*" (Emphasis supplied) 411 U. S. at 179, 93 S.Ct. at 1266.

On the other hand, the *Mescalero* court had little difficulty in finding that when a tribe ran a ski resort on certain leased federal lands, the ski resort's income was subject to state taxation. The Court ruled such taxation was not an undue interference with tribal self-government. In *Mescalero* the court quoted with approval Shaw v. Gibson-Zahniser Oil Co., 276 U.S. 575, 579–581, 48 S.Ct. 333, 72 L.Ed. 709 (1928) and said:

" 'The early legislation affecting the Indians had as its immediate object the closest control by the government of their lives and property. The first and principal need then was that they should be shielded alike from their own improvidence and the spoliation of others but the ultimate purpose was to give them the more independent and responsible status of citizens and property owners * * *.

"But * * * [t]o hold them immune would be inconsistent with one of the very purposes of their creation, to educate the Indians in responsibility * * *.' " 93 S.Ct. at 1273.

The Washington Court in *Tonasket* stated:

"It is suggested by the plaintiff that the regulating and taxing of his sales of cigarettes by the state interferes with tribal government.

\*     \*     \*     \*     \*     \*

"The plaintiff in this case has entered into the commercial life of the community in which he lives. He sells a product manufactured by others, the sale of which the state has found it desirable and necessary to regulate. The plaintiff does not question the right of the state to impose a tax upon the sale of cigarettes generally. But he contends that he should be exempt from the duty of collecting and remitting the tax and should thus enjoy a competitive advantage over nonIndian sellers of cigarettes." 488 P.2d at 288.

I suggest that the State in the instant case did not interfere with tribal self-government of the Coeur d'Alene Indians. I believe the taxation of the plaintiff herein is no different than that of any other who has set up a business. Having entered commerce, the Indian plaintiff must shoulder his fair share of the community's tax burden.

BAKES, Justice (concurring specially and dissenting in part:

The majority of this Court has determined the Idaho cigarette tax to be a tax upon the retail sale of cigarettes. Therefore, the result reached by the majority is probably correct because the cigarettes in question here were seized before they were sold at retail, and therefore technically no tax was due and owing by the plaintiff on them. However, in my view, the incidence of the tax imposed by the Idaho Cigarette Tax Act can occur, and in this case does occur much earlier in the chain of distribution than the retail sale, and this raises serious constitutional issues. However in view of the holding of the majority concerning the nature of the Idaho cigarette tax, no useful purpose would be served by an analysis of all of the possible constitutional ramifications which would result from a holding that the incidence of the Idaho cigarette tax occurs much earlier in the distribution chain than the retail sale.

ON PETITION FOR REHEARING

Donaldson, Justice.

The petition for rehearing in the above entitled action was granted and reargued. The Court has reviewed the record, considered the arguments presented by counsel, and we continue to adhere to the views expressed and the conclusion reached in our earlier opinion.

McQUADE and McFADDEN, JJ., concur.

SHEPARD, C. J., adheres to his dissent in the earlier opinion.

BAKES, J., adheres to his special concurrence and dissent in the earlier opinion.