The **CONFEDERATED SALISH AND KOOTENAI TRIBES OF the FLATHEAD RESERVATION, MONTANA ("TRIBES"), et al., Plaintiffs,**

v.

**John C. MOE, Individually and in his official capacity as sheriff IN AND FOR the COUNTY OF MISSOULA, MONTANA, et al., Defendants.**

Civ. No. 2145.

United States District Court,
D. Montana,
Missoula Division.

May 10, 1974.

Supplemental Order and Opinion
Feb. 4, 1975.

Wilkinson, Cragun & Barker and Richard A. Baenen, Washington, D. C. and Victor F. Valgenti, Missoula, Mont., for plaintiffs.

Robert L. Deschamps, III, County Atty., and Harold V. Dye, Asst. County Atty., Missoula, Mont., for John C. Moe.

Robert L. Woodahl, Atty. Gen., and Dennis E. Lind, Thomas J. Beers and William N. Jensen, Asst. Attys. Gen., for the State of Montana, Helena, Mont., who also represented the State of Montana.

Sam E. Haddon, Spec. Asst. Atty., for defendants.

Richard P. Heinz and Jean A. Turnage, Polson, Mont., for William A. Phillips.

Terry B. Cosgrove and R. Bruce McGinnis, Tax Counsel, Helena, Mont., for Dept. of Revenue.

Alex C. Morrison, Sanders County Atty., Thompson Falls, Mont., for defendant.

### ORDER AND OPINION

Before BROWNING, Circuit Judge, and SMITH and JAMESON, District Judges.

PER CURIAM:

This is an action by the Confederated Salish and Kootenai Tribes of the Flathead Reservation and three enrolled members of the Tribes, suing on behalf of themselves and all other members of the Tribes, "seeking to declare unconstitutional the enforcement against plaintiffs of Title 84, Rev.Mont.Code §§ 5606 et seq., the Montana cigarette sales tax and dealer licensing statutes" and for an injunction restraining the enforcement of the statutes and any regulations promulgated pursuant thereto.[1] A three-judge court was convened pursuant to 28 U.S.C. § 2281.

The defendants named in the complaint, John C. Moe, Sherriff of Missoula County, and William A. Phillips, Sheriff of Lake County, filed motions to dismiss, Phillips including a motion to join the Department of Revenue of the State of Montana as a necessary party defendant. Plaintiffs filed a motion for summary judgment with supporting affidavits.[2]

In an opinion dated October 10, 1973[3] we held that (1) this court has subject matter jurisdiction of plaintiffs' claims; and (2) under McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 93 S. Ct. 1257, 36 L.Ed.2d 129 (1973), "Montana may not impose its cigarette tax upon sales of cigarettes on the Flathead Reservation between members of the Tribes; nor may Montana require a member of the Tribes who sells cigarettes on the Flathead Reservation to possess its cigarette dealer's license." The opinion noted that "the sole question on which there is any substantial dispute on the merits is whether the State of Montana may require an enrolled member of the Tribes who sells cigarettes on the Flathead Reservation to a non-Indian to 'precollect'" the Montana cigarette tax, and that the proce-

---

1. Section 84–5606, R.C.M.1947, imposes an excise tax upon cigarettes sold or purchased in the State of Montana. Subsection (1) reads:

 "All taxes paid pursuant to the provisions of this section shall be conclusively presumed to be direct taxes on the retail consumer precollected for the purpose of convenience and facility only. When the tax is paid by any other person such payment shall be considered as an advance payment and shall be added to the price of the cigarettes and recovered from the ultimate consumer or user. Any person selling cigarettes at retail shall state or separately display in the licensed premises a notice of the tax included in the selling price and charged or payable pursuant to this section. The provisions of this subdivision shall in no way affect the method of collection of such tax as provided by this section."

 Section 84–5606.5 imposes a retailer's license tax and a "retailer" is defined by § 84–5606.2(j) as "any person other than a wholesaler, who is engaged in the business of selling cigarettes at retail".

2. No counter affidavits have been filed, but the defendant Moe filed a motion to hold plaintiffs' motion for summary judgment in abeyance pending determination of defendants' motions to dismiss.

3. Portions of the opinion of October 10, 1973 will be repeated in this order and opinion.

dural questions raised by defendants, i. e., the need for abstention and the propriety of a three-judge court, "might well be obviated by the addition of the Department of Revenue as a party defendant".

Plaintiffs filed a motion to add as defendants the Department of Revenue and its Director, and this motion was granted on November 2, 1973. Supplemental memoranda with respect to the application of the cigarette tax to a sale to a non-Indian have been filed by plaintiffs and by the Department of Revenue and the Attorney General of Montana for defendants. The defendant Moe filed a supplemental motion to dismiss, which has been denied in a separate order.

## Factual Background

It appears from the allegations in the complaint and the affidavits filed in support of plaintiffs' motion for summary judgment that the plaintiff Wheeler,[4] a member of the Tribes, leased from the Tribes small tracts of trust land within the Flathead Reservation. On these tracts, one of which is in Missoula County, the other in Lake County, Wheeler, who did not have a state license to sell cigarettes, established retail stores which sold cigarettes to which state tax stamps were not affixed.

On April 13, 1972 Wheeler was arrested by deputies of the Missoula County Sheriff's Office for selling cigarettes on the Missoula County tract without a state license and for not having a state cigarette tax stamp affixed to each package sold. Subsequently, sheriff's deputies confiscated approximately 1,350 cartons of Wheeler's cigarettes. At the time of both the arrest and confiscation the deputies tore down signs on the door of Wheeler's store advertising cigarettes for sale. Also on April 13, 1972 officers from the Lake County Sheriff's Office arrested the plaintiff Clinkenbeard, the keeper of Wheeler's store located on the Lake County tract, for the same offenses. No cigarettes were confiscated from this store.

## Contentions of Parties

Plaintiffs contend that the application of Montana's cigarette tax and dealer licensing statutes to sales of cigarettes on the Flathead Reservation by enrolled members of the Tribes is unconstitutional and a violation of tribal sovereignty under Article I, § 8, cl. 3 of the United States Constitution; the Treaty of Hellgate, 12 Stat. 975, July 16, 1855; the Organic Act for the Territory of Montana, 13 Stat. 85, May 26, 1864; and the Enabling Act of the State of Montana, 25 Stat. 676, February 22, 1889. Plaintiffs admit that Montana may, under P.L. 280 (67 Stat. 588, August 15, 1953), have assumed some jurisdiction over the Tribes, but contend that the assumed jurisdiction does not include the power to apply Montana's cigarette tax and dealer licensing statutes to cigarette sales on the Reservation by members of the Tribes.

Defendants in urging dismissal upon jurisdictional grounds contend that 28 U.S.C. § 1341 prohibits this court from enjoining application of Montana's cigarette tax statutes. On the merits defendants contend that Montana has the power to require a member of the plaintiff Tribes "to precollect, for the state, its cigarette excise tax when such member sells cigarettes to a non-Indian within the exterior boundaries of the Flathead Reservation".[5]

## Subject Matter Jurisdiction

The defendants first argue that 28 U.S.C. § 1341 prohibits this court from enjoining enforcement of Montana's ciga-

<hr>

4. On August 24, 1973 counsel for plaintiffs filed a "Suggestion of Death" of the plaintiff Joseph Anthony Wheeler, Jr. on August 11, 1973.

5. As noted *infra*, defendants in effect have accepted the ruling of this court in its October 10 opinion that the State may not impose its excise tax upon sales to members of the Tribes residing on the Reservation.

**1302**

rette tax and dealer licensing statutes. Section 1341 provides: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."

§ 1341 was enacted in 1937 (Act of August 21, 1937, 50 Stat. 738) as an amendment to § 24 of the Judicial Code. From its legislative history it is clear that Congress was concerned with correcting "the disparity between the rights of a citizen of a state, whose only means of litigating his disputed tax liabilities was a [state court] suit for refund for prepaid taxes, and those of foreign corporations and nonresidents, doing business within the state and incurring tax obligations, who could [because of diversity jurisdiction] obtain in the federal courts equitable relief[6] denied to citizens of the state."[7] United States v. Livingston, 179 F.Supp. 9, 11 (E.D.S.C.1959), aff'd, 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960).

■ In spite of the seemingly unequivocal language of § 1341, the courts have recognized many exceptions in its application. Thus, in Dept. of Employment v. United States, 385 U.S. 355, 358, 87 S.Ct. 464, 467, 17 L.Ed.2d 414 (1966) the Court held that "§ 1341 does not act as a restriction upon suits by the United States to protect itself and its instrumentalities from unconstitutional state exactions." This exception is based upon the well established rule that legislative restrictions upon the exercise of remedial rights are not binding upon the sovereign unless clearly and expressly stated and upon the fact that a suit by the United States to assert its constitutional immunity from state taxation does not involve the evils that § 1341

was designed to correct or the interpretation or application of state laws. *Livingston, supra* at 11–12. See also, for example, United States v. Woodworth, 170 F.2d 1019, 1020 (2 Cir. 1948) ("Congress did not intend [§ 1341] * * * to apply to the United States which was not specifically named therein.") and Board of Com'rs of Pawnee County, Okl. v. United States, 139 F.2d 248, 250 (10 Cir. 1943), cert. denied, 321 U.S. 795, 64 S.Ct. 846, 88 L.Ed. 1084 (1944) ("[§ 1341] does not * * * specifically mention the United States, and it is seriously questioned whether the restrictive provisions of [§ 1341] were intended to apply to suits brought by the United States.")

■ The exception stated in *Dept. of Employment* has been held to apply where the asserted tax immunity is based upon Congressional legislation, as well as the United States Constitution, and does not necessarily depend upon the existence of a proprietary interest in the Government. Thus, in United States v. Arlington County, Commonwealth of Virginia, 326 F.2d 929, 931 (4 Cir. 1964) it was held that § 1341 does not bar a federal court action brought by the United States on behalf of its servicemen to protect and enforce the Government's statutory policies against state taxation of members of the Armed Forces. See also Sullivan v. United States, 395 U.S. 169, 170, n. 2, 89 S.Ct. 1648, 23 L.Ed.2d 182 (1969). Moreover, the exception applies even where, as here, the United States is not a party plaintiff, if the suit could have been brought by the United States and is in fact brought by parties who could properly be co-plaintiffs with the United States. Agua Caliente Bank of Mission Ind. v. County of Riverside, 442 F.2d

---

6. "The existing practice of the Federal courts to entertain tax-injunction suits makes it possible for foreign corporations to withhold from a State and its govenmental subdivisions taxes in such vast amounts and for such long periods as to disrupt State and county finances, and thus make it possible

for such corporations to determine for themselves the amount of taxes they will pay." 81 Cong.Rec. 1416 (1937).

7. See S.Rep.No.1035, 75th Cong., 1st Sess., pp. 2–3 (1937) ; H.R.Rep.No.1503, 75th Cong., 1st Sess., pp. 2–3 (1937) ; 81 Cong. Rec. 1416–1417 (1937).

1184, 1186 (9 Cir. 1971), cert. denied, 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972).[8]

■ While the exceptions to § 1341 have been expressed most often in terms of the Federal instrumentality doctrine, we do not view the exceptions as limited to cases where this doctrine is clearly applicable. It seems clear from the decided cases and the legislative history of § 1341 that this section does not bar federal court jurisdiction in cases where immunity from state taxation is asserted on the basis of federal law with respect to persons or entities in which the United States has a real and significant interest. Accordingly, it is not essential for jurisdictional purposes that a threshold finding be made with respect to the complex issue of whether plaintiff Wheeler's business venture is an instrumentality of the Federal Government.[9]

■ There can be no doubt that the United States has a real and significant interest in the Tribes and its members, who are wards of the Government with respect to which "it has charged itself with moral obligations of the highest responsibility and trust". Seminole Nation v. United States, 316 U.S. 286, 297, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942). This Governmental interest has manifested itself in the form of a federal legislative policy to protect reservation Indians from the application of state tax laws, see *McClanahan, supra* at 173–179,

and it is upon the basis of this federal policy that plaintiffs claim they are exempt from the application of Montana's cigarette tax and dealer licensing statutes. Finally, it is clear that the United States would have standing to have brought this action, since as was said in McCarty v. Hollis, 120 F.2d 540, 542 (10 Cir. 1941), "The United States, in its own behalf and in its capacity as guardian of Indian tribes or individual Indians, may institute and maintain in the federal courts appropriate suits for the enforcement of the rights or the protection of the property of its Indian wards."[10]

■■ We conclude that the United States could have brought this action in federal court, irrespective of § 1341, based upon the interest of the United States in protecting reservation Indians from state taxation and the fact that the asserted tax immunity is based solely upon federal law. Under *Agua, supra,* plaintiffs may take advantage of the right of the United States to maintain this action without regard to § 1341 if there is an independent basis for federal jurisdiction of their claims.

28 U.S.C. § 1362 provides:

"1362. Indian tribes.—The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitu-

---

8. The court in *Agua* stated that "The reasons given in United States v. Livingston, *supra,* for exempting instrumentalities of the United States from the operation of 28 U.S.C. Section 1341 are no less cogent when the right to the exemption is asserted by one who properly could be a co-plaintiff with the United States."

9. In our opinion of October 10 we stated that this case falls within the Federal instrumentality doctrine. The Court of Appeals for the Ninth Circuit reached the same conclusion in Moses v. Kinnear, 480 F.2d 21 (1973) in an opinion by Judge Jameson. Under Mescalero Apache Tribe v. Jones, 411 U.S. 145, 150–155, 93 S.Ct. 1297, 36 L.Ed.2d 114 (1973) and *McClanahan, supra* at 169–

170 and n. 5, it now appears that the Federal instrumentality doctrine as a basis for immunity from state taxation with respect to Indians and Indian property is questionable. Compare, however, U.S. Dept. of the Interior, Federal Indian Law 845–6 (1958), a portion of which was quoted with approval in *McClanahan* at 170–171, as noted *infra.*

10. See also Heckman v. United States, 224 U.S. 413, 441, 32 S.Ct. 424, 433, 56 L.Ed. 820 (1912) where the Court recognized the right of the United States to sue in federal court on the basis of "the interest of the United States in securing immunity to the Indians from taxation conflicting with the measures it had adopted for their protection".

tion, laws, or treaties of the United States. (Oct. 10, 1966, P.L. 89–635, § 1, 80 Stat. 880.)"

In addition to providing a basis for federal court jurisdiction with respect to the Tribes, § 1362 supplies an additional reason for holding that § 1341 is not applicable here. It is clear from the legislative history of § 1362 that one of the purposes of the legislation was to permit Indian tribes to initiate litigation in federal court in those cases where the United States as guardian and trustee could have invoked federal jurisdiction.[11] Since § 1341 would not bar an action in federal court by the United States, it is not a bar to this action in view of the clear Congressional intent to allow tribes the same access to federal courts as is enjoyed by the United States as trustee and guardian.

 While § 1362 does not confer jurisdiction with respect to the individual plaintiffs,[12] we conclude that this jurisdiction is conferred by 28 U.S.C. § 1343(3) which provides in pertinent part:

"1343. Civil rights and elective franchise.—The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

* * * * * *

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;"

Plaintiffs have alleged a violation of 42 U.S.C. § 1983, based upon alleged deprivations of rights secured under the Commerce Clause, the Hellgate treaty, and the Montana Organic and Enabling Acts. Section 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Although § 1983 was enacted primarily to enforce the Fourteenth Amendment, Lynch v. Household Finance Corp., 405 U.S. 538, 545, 92 S.Ct. 1113,

---

11. The Report of the House Judiciary Committee (H.R.Rep.No.2040, 89th Cong., 2d Sess. (1966) on S. 1356, which became the Act of October 10, 1966, reads in part:
"The purpose of the proposed legislation is to provide that the district courts are to have original jurisdiction of *all* civil actions brought by Indian tribes or bands wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States. (Emphasis added.)

* * * * *

"The committee feels that there is another factor which is relevant in this situation and serves to emphasize the justification for enactment of this bill. The United States as trustee can initiate litigation involving issues identical to those which would be presented in cases brought under the new section. The enactment of this bill would provide for U.S. district court jurisdiction in those cases

where the U.S. attorney declines to bring an action and the tribe elects to bring the action. As is observed in the Department of the Interior report, the tribes would then have access to the Federal courts through their own attorneys. It can therefore be seen that the bill provides the means whereby the tribes are assured of the same judicial determination whether the action is brought in their behalf by the Government or by their own attorneys. There is a large body of Federal law which states the relationship, obligations and duties which exists between the United States and the Indian tribes. The federal forum is therefore appropriate for litigation involving such issues."

12. See Quinault Tribe of Indians v. Gallagher, 368 F.2d 648, 656 (9 Cir. 1966).

31 L.Ed.2d 424 (1972), the Court held in *Lynch* that the phrase "rights, privileges, or immunities secured by the Constitution and laws" includes not only Fourteenth Amendment rights, but "[*all* of] the Constitution [and] laws of the United States", noting its interpretation of similar language with respect to 18 U.S.C. § 242 in United States v. Price, 383 U.S. 787, 797, 86 S.Ct. 1152, 16 L. Ed.2d 267 (1966). 405 U.S. at 549, n. 16. We therefore have no difficulty in holding that plaintiffs' alleged violation of Commerce Clause rights is sufficient to state a claim under § 1983.

§ 1343(3) is the "jurisdictional counterpart" of § 1983, and it was held in *Lynch* that "Despite the different wording of the substantive and jurisdictional provisions, when the § 1983 claim alleges constitutional violations, § 1343(3) provides jurisdiction and both sections are construed identically." 405 U.S. at 544, n. 7.[13]

We conclude that this court has subject matter jurisdiction over the plaintiffs' claims, under 28 U.S.C. §§ 1343(3) and 1362, and that this jurisdiction is not defeated by 28 U.S.C. § 1341.

### Sales of Cigarettes to Members of Tribes

In McClanahan v. Arizona State Tax Comm'n, *supra*, the Court held that the State of Arizona has no jurisdiction to impose a tax on the income of Navajo Indians residing on the Navajo Reservation, whose income is wholly derived from reservation sources. The Court quoted with approval "a leading text on Indian problems" as summarizing "the relevant law: 'State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply. It follows that Indians and Indian property on an Indian reservation are not subject to State taxation except by virtue of express authority conferred upon the State by Act of Congress.' U. S. Dept. of the Interior, Federal Indian Law 845 (1958) * * *." *Id.*, 411 U.S. at 170–174.[14]

The Court

"noted that Congress has now provided a method whereby States may assume jurisdiction over reservation Indians. Title 25 U.S.C. § 1322(a) grants the consent of the United States to States wishing to assume criminal and civil jurisdiction over reservation Indians, and 25 U.S.C. § 1324 confers upon the States the right to disregard enabling acts which limit their authority over such Indians. But the Act expressly provides that the State must act 'with the consent of the tribe occupying the particular Indian country,' 25 U.S.C. § 1322(a), and must 'appropriately [amend its] constitution or statutes.' 25 U.S.C. § 1324. Once again, the Act cannot be

13. While it may be argued that the phrase "for equal rights of citizens or of all persons within the jurisdiction of the United States" modifies both "Constitution of the United States" and "Act of Congress", implicit in this holding in *Lynch* is the conclusion that the qualifying phrase applies only to "Act of Congress".

It may be noted also that a long line of cases held that § 1343(3) confers jurisdiction for violations of 42 U.S.C. § 1983 rights only as to deprivations of personal liberty, and not, as are involved here, monetary or proprietary rights. This question was also resolved in *Lynch*, the Court stating that "This Court has never adopted the distinction between personal liberties and proprietary rights as a guide to the contours of §

1343(3) jurisdiction. Today we expressly reject that distinction." (Footnotes omitted.) 405 U.S. at 542.

14. The Court explained that this principle of Indian sovereignty did not provide a "definitive resolution" of the issues, but was "a backdrop against which the applicable treaties and federal statutes must be read". *McClanahan, supra* at 172. The Court continued with a detailed analysis of the relevant treaty and statutory provisions, which are essentially the same as those involved in this case, and concluded that "When the relevant treaty and statutes are read with this tradition of sovereignty in mind, we think it clear that Arizona has exceeded its lawful authority by attempting to tax appellant." *Id.* at 173.

**1306**

read as expressly conferring tax immunity upon Indians. But we cannot believe that Congress would have required the consent of the Indians affected and the amendment of those state constitutions which prohibit the assumption of jurisdiction if the States were free to accomplish the same goal unilaterally by simple legislative enactment. See Kennerly v. District Court, 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971)." [15] *Id.* at 177–178. (Footnotes omitted.)

Montana has not acted pursuant to 25 U.S.C. §§ 1322 and 1324 to assume jurisdiction over the Tribes, but did take action under their predecessor statute. Pursuant to P.L. 280, 67 Stat. 588, August 15, 1953, the State of Montana assumed complete criminal and limited civil jurisdiction over the Indians residing on the Flathead Reservation.[16] This assumption of jurisdiction raises two issues: (1) whether Montana's cigarette excise tax and dealer licensing tax are criminal in nature; and (2) whether, if not criminal, the power to license cigarette dealers and tax cigarettes has been assumed under the limited assumption of civil jurisdiction.

■ It is evident that the taxing statutes are civil revenue collecting provisions, even though they are subject to being enforced by criminal penalties. If the civil revenue collecting provisions are not applicable to plaintiffs in the first instance, then neither are their criminal enforcement provisions.

■ Montana's limited assumption of civil jurisdiction over the Flathead Reservation Indians includes only the following: compulsory school attendance; public welfare; domestic relations (except adoptions); mental health, insanity, care of the infirm, aged and afflicted; juvenile delinquency and youth rehabilitation; adoption proceedings (with the consent of the tribal court); abandoned, dependent, neglected, orphaned or abused children; and operation of motor vehicles upon the public streets, alleys, roads and highways.[17] Clearly, the power to impose cigarette and licensing taxes is not among the categories of assumed civil jurisdiction.

In Kennerly v. District Court, 400 U. S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971), the Court held that in the absence of compliance with 25 U.S.C. § 1322 the Montana courts may not exercise civil or criminal jurisdiction over Indians on the Blackfeet Reservation, where the situation with respect to allotment and settlement is essentially the same as on the Flathead Reservation. In so holding the Court expressly relied upon Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), a landmark decision on Indian sovereignty involving an action against a Navajo Indian on a transaction arising on the Navajo Reservation. In turn, the Court in *McClanahan* relied on *Kennerly* in holding that the Arizona courts "can exercise neither civil nor criminal jurisdiction over reservation Indians". 411 U.S. at 178.

---

15. In a footnote the Court stated that "We do not suggest that Arizona would necessarily be empowered to impose this tax had it followed the procedures outlined in 25 U.S.C. § 1322 et seq. Cf. 25 U.S.C. § 1322(b). That question is not presently before us, and we express no views on it." *Id.* at 178, n. 18.

16. Plaintiffs contest the validity of this Montana assumption of jurisdiction. However, we need not decide this issue here, and accordingly express no opinion on it. For the purpose of deciding this case we will assume

that Montana's assumption of jurisdiction over the Flathead Reservation Indians is valid under P.L. 280.

17. See §§ 83–801 to 83–806, R.C.M.1947. Following receipt of Tribal Ordinance 40–A (Revised) of the Confederated Tribes, the Governor of Montana on October 8, 1965 accepted criminal and civil jurisdiction as expressed in that Ordinance. For a discussion of proceedings subsequent to this action see Security State Bank v. Pierre, 511 P.2d 325, 328 (Mont.1973).

In *McClanahan*, the Court, after noting that Indians are citizens, have the right to vote, use state courts, and receive some state services, continued:

"But it is nonetheless still true, as it was in the last century, that '[t]he relation of the Indian tribes living within the borders of the United States . . . [is] an anomalous one and of a complex character. . . . They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided. United States v. Kagama, 118 U. S. 375 at 381–382, 6 S.Ct. 1109, 30 L. Ed. 228." 411 U.S. at 173.

In a footnote on the same page the Court observed:

"The court below pointed out that Arizona was expending tax monies for education and welfare within the confines of the Navajo Reservation. See [McClanahan v. State Tax Commission] 14 Ariz.App. [452], at 456–457, 484 P.2d [221], at 225–226. It should be noted, however, that the Federal Government defrays 80% of Arizona's ordinary social security payments to reservation Indians, see 25 U.S.C. § 639, and has authorized the expenditure of more than $88 million for rehabilitation programs for Navajos and Hopis living on reservations. See also 25 U.S.C. §§ 13, 309, 309a. Moreover, '[c]onferring rights and privileges on these Indians cannot affect their situation, which can only be changed by treaty stipulation, or a voluntary abandonment of their tribal organization.' The Kansas Indians, 5 Wall. [737], at 757, [8 L.Ed. 667]." *Id.* at n. 12.

The tax exemption does not apply to all Indians, but only to reservation Indians, and is based upon their status under their tribal organization, with respect to which the Court noted in *McClanahan*: "It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government." 411 U.S. at 172.

As in Arizona, the State of Montana expends tax moneys for education, welfare and other services within the confines of all Indian reservations, including the Flathead Reservation. It is likewise true, however, in Montana, as in Arizona, that the Federal Government expends substantial sums for Indian health and education and numerous vocational and rehabilitation programs pursuant to 25 U.S.C. §§ 13, 309, 309a and 452 and 42 U.S.C. §§ 2001–2005.

We affirm the conclusion set forth in our opinion of October 10, 1973 that under *McClanahan* Montana may not impose its cigarette tax upon sales of cigarettes on the Flathead Reservation between members of the Tribes; nor may Montana require a member of the Tribes who sells cigarettes on the Flathead Reservation to possess its cigarette dealer's license.[18]

### Sales to Non-Indians on Reservation

 While Montana may not impose its cigarette excise tax on members of the Tribes who purchase cigarettes from other members on the Flathead Reservation[19] or require a dealer's li-

---

18. Counsel for defendants recognize that *McClanahan* "would certainly appear to apply to the imposition of a tax by the state of Montana, department of revenue, against an Indian residing within the boundaries of an Indian reservation, on cigarettes purchased within the reservation".

19. For the reasons hereinafter set forth we conclude that the tax may not be imposed on sales to all Indians who are residents of the Flathead Reservation, whether or not they are members of the plaintiff Tribes.

cense tax from the member seller, a more difficult question is presented with respect to the sale of cigarettes to non-Indians. By express statutory provision the taxes are "conclusively presumed to be direct taxes on the retail consumer precollected for the purpose of convenience and facility only". Section 84–5606(1), R.C.M.1947. When the tax is paid by the seller it is "considered as an advance payment and shall be added to the price of the cigarettes and recovered from the ultimate consumer or user". *Id.* In other words, the seller pays the tax to the wholesaler and adds it to the purchase price of the cigarettes.

In a sale to a non-Indian without payment of the tax, it is the non-Indian consumer or user who saves the tax and reaps the benefit of the tax exemption. It is of course recognized that the seller would have a competitive advantage over non-Indian sellers on the Reservation as well as both Indian and non-Indian sellers off the Reservation through selling cigarettes at a lower price.

Against this factual background we must determine whether the State of Montana is precluded from requiring a member of the Tribes to precollect the tax if he wishes to sell cigarettes to non-Indians on the Flathead Reservation. He is not of course obligated to sell to non-Indians. In other words, does the established principle of federal pre-emption in taxation and regulations of Indian trading extend to the sale of cigarettes to non-Indians under this factual situation?

In the leading case of Warren Trading Post v. Arizona Tax Comm'n, 380 U.S. 685, 691–692, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), the Court invalidated the imposition by the State of Arizona of a gross income tax on a non-Indian trader licensed by the Federal Government "with respect to sales made to reservation Indians on the reservation". The Court said in part:

"We think the assessment and collection of this tax would to a substantial extent frustrate the evident congres-sional purpose of ensuring that no burden shall be imposed upon Indian traders for trading with Indians on reservations except as authorized by Acts of Congress or by valid regulations promulgated under those Acts. This state tax on gross income would put financial burdens on appellant or the Indians with whom it deals in addition to those Congress or the tribes have prescribed, and could thereby disturb and disarrange the statutory plan Congress set up in order to protect Indians against prices deemed unfair or unreasonable by the Indian Commissioner. And since federal legislation has left the State with no duties or responsibilities respecting the reservation Indians, we cannot believe that Congress intended to leave to the State the privilege of levying this tax. 380 U.S. at 690–691.

In *McClanahan, supra* at 165, the Court at the outset recognized the requirement "again to reconcile the plenary power of the States over residents within their borders with the semi-autonomous status of Indians living on tribal reservations". In referring to *Warren Trading Post, supra,* the Court pointed out that the tax there was held invalid in part "because 'Congress has, since the creation of the Navajo Reservation nearly a century ago, left the Indians on it largely free to run the reservation and its affairs without state control, a policy which has automatically relieved Arizona of all burdens for carrying on those same responsibilities.' Warren Trading Post Co. v. Arizona Tax Comm'n, 380 U.S. 685, 690, [85 U.S. 1242, 14 L.Ed.2d 165] (1965)." 411 U. S. at 170, n. 6. In holding that a state is precluded from imposing a tax on the income of reservation Indians wholly derived from reservation sources, the Court said in part:

"Indeed, Congress' intent to maintain the tax exempt status of reservation Indians is especially clear in light of the Buck Act, 4 U.S.C. § 104 *et seq.,* which provides comprehensive

federal guidance for state taxation of those living within federal areas. Section 106(a) of Title 4 U.S.C. grants to the States general authority to impose an income tax on residents of federal areas, but § 109 expressly provides that '[n]othing in sections 105 and 106 of this title shall be deemed to authorize the levy or collection of any tax on or from any Indian not otherwise taxed.' To be sure, the language of the statute itself does not make clear whether the reference to 'any Indian not otherwise taxed' was intended to apply to reservation Indians earning their income on the reservation. But the legislative history makes plain that this proviso was meant to except reservation Indians from coverage of the Buck Act, see S. Rep.No.1625, 76th Cong., 3d Sess., 2, 4 (1940); 84 Cong.Rec. 10685, and this Court has so interpreted it." *Id.* at 176–177.

On the other hand, the Court also recognized in *McClanahan* that "the Indian sovereignty doctrine, with its concomitant jursisdictional limit on the reach of state law" has not "remained static during the 141 years since *Worcester* (Worcester v. Georgia, 6 Pet. 515, 557, 8 L.Ed. 483 (1832)) was decided". *Id.* at 171. The Court noted that "notions of Indian sovereignty have been adjusted to take account of the State's legitimate interests in regulating the affairs of non-Indians", the Court continuing:

"This line of cases was summarized in this Court's landmark decision in Williams v. Lee, 358 U.S. 217, [79 S.Ct. 269, 3 L.Ed.2d 251] (1959): 'Over the years this Court has modified [the *Worcester* principle] in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized. . . . Thus, suits by Indians against outsiders in state courts have been sanctioned. . . . And state courts have been allowed to try non-Indians who committed crimes against each other on a reservation. . . .

But if the crime was by or against an Indian, tribal jurisdiction or that expressly conferred on other courts by Congress has remained exclusive. . . . Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.' *Id.,* [358 U.S.] at 219–220, [79 S.Ct. at 270.] (footnote omitted)." *Id.* at 171–172.

In Mescalero Apache Tribe v. Jones, *supra,* the Court held that the State of New Mexico may impose a nondiscriminatory gross receipts tax on a ski resort operated by the Tribe on off reservation land leased from the Federal Government, even though the land itself was exempt from state taxation under § 5 of the Indian Reorganization Act, 25 U.S.C. § 465. The Court held further that § 465 barred a use tax imposed on personalty that the Tribe installed because it was "so intimately connected with the use of the land itself" as to be encompassed by the statutory exemption. 411 U.S. at 158.

*Mescalero* rejected the "Tribe's broad claims of tax immunity" based upon the "expansive version of the intergovernmental-immunity doctrine", *Id.* at 155, referring, *inter alia,* to Oklahoma Tax Comm'n v. Texas Co., 336 U.S. 342, 69 S.Ct. 561, 93 L.Ed. 721 (1949)

"where the Court cut to the bone the proposition that restricted Indian lands and the proceeds from them were—as a matter of constitutional law—automatically exempt from state taxation. Rather, the Court held that Congress has the power 'to immunize these lessees from the taxes we think the Constitution permits Oklahoma to impose in the absence of such action' and that '[t]he question whether immunity shall be extended in situations like these is essentially legislative in character.' Oklahoma Tax Comm'n v. Texas Co., *supra,* at 365–366, 69 S.Ct., at 574." *Id.* at 150.

Recognizing that the exemption of Indian lands from state taxation is not all inclusive, the Court said further:

"Absent a 'definitely expressed' exemption, an Indian's royalty income from Indian oil lands is subject to the federal income tax although the source of the income may be exempt from the tax. Choteau v. Burnet, 283 U.S. 691, 696–697, [51 S.Ct. 598, 75 L.Ed. 1353] (1931). The Court has also held that a State, as well as the Federal Government, may tax an Indian's pro rata share of income from a tribe's restricted mineral resources. Leahy v. State Treasurer, 297 U.S. 420, 56 S. Ct. 507, 80 L.Ed. 771 (1936). Lessees of otherwise exempt Indian lands are also subject to state taxation. Oklahoma Tax Comm'n v. Texas Co., 336 U.S. 342, [69 S.Ct. 561, 93 L.Ed. 721] (1949)." *Id.* at 156–157.

The general rule with respect to the "domain of power of the Federal Government over Indian affairs, judicially marked out", was summarized in U.S. Dept. of the Interior, Federal Indian Law 504 (1958) in part as follows:

"Thus, without questioning the constitutional doctrine that States possess original and complete sovereignty over their own territories save insofar as such sovereignty is limited by the Federal Constitution, a sense of realism compels the conclusion that control of Indian affairs has been assumed under the Constitution, by the Federal Government and that State jurisdiction in any matters affecting Indians can be upheld only if one of two conditions is met: either that Congress has expressly delegated to the State, or recognized in the State, some power of government respecting Indians; or that a question involving Indians involves non-Indians to a degree which calls into play the jurisdiction of a State government."

With reference to "Non-Indian Activities" the same text reads in part:

"We have already noted the general rule that the Indian country within a State ordinarily is not regarded as an area of exclusive Federal jurisdiction but is politically and governmentally a part of the State in which State laws apply to the extent that they do not conflict with Federal Indian law. The scope of State jurisdiction was indicated by the Supreme Court in United States v. McGowan, (302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938)) as follows:

* * * Enactments of the Federal Government passed to protect and guard its Indian wards only affect the operation, within the colony [or reservation], of such state laws as conflict with the federal enactments (p. 539).

So considered, the general jurisdiction of the State over non-Indians extends throughout the territorial limits of the State save as may be limited by Federal enactment. Thus, it has been held that murder of a non-Indian by a non-Indian on an Indian reservation, in the absence of express Federal legislation to the contrary, is a matter of exclusive State jurisdiction. Likewise the validity of State taxation of personalty of a non-Indian within Indian country has been sustained."[20] (Footnotes omitted.) *Id.*, at 513–514.

It is clear that the Supreme Court has not passed upon the question here presented. With respect to sales of cigarettes to non-Indians, the case does not involve a tax imposed upon the income of an Indian earned on an Indian reservation, or a property or use tax on reservation land or personalty owned by an

20. Citing Thomas v. Gay, 169 U.S. 264, 273, 18 S.Ct. 340, 343, 42 L.Ed. 740 (1898) where the Court held valid a state tax on cattle owned by a non-Indian lessee on an Indian reservation, saying, "But it is obvious that a tax put upon the cattle of the lessees is too remote and indirect to be deemed a tax upon the lands or privileges of the Indians."

Indian, or a sales tax imposed on an Indian on the reservation. On the other hand, the sales were of course made by a member of the Tribes on the Flathead Reservation. The case does not clearly come within the recognized exceptions to the principle of federal pre-emption in the taxation of Indians and regulation of Indian trading on an Indian reservation.

This issue was before the Supreme Court in Tonasket v. Washington, 411 U.S. 451, 93 S.Ct. 1941, 36 L.Ed.2d 385, but this case was remanded to the Supreme Court of Washington on April 24, 1973 for "reconsideration in light of §§ 6 and 7 of c. 157, 1972 Extraordinary Session Laws of the State of Washington, and this Court's decision in McClanahan v. Arizona State Tax Comm'n, [ante, p. 164]." *Tonasket*, like this case, involves the sale of cigarettes to both Indians and non-Indians. In a brief filed for the United States as amicus curiae, at the request of the Court, the Solicitor General, relying in part on *Warren Trading Post, supra*, argued that the taxes were "invalid insofar as they apply to sales to Indians residing on the Reservation", but expressed no opinion on the claimed exemption on sales to non-Indians.[21]

We are not here concerned with a licensed trader establishing retail stores for the benefit of Indians residing on the reservation, as was the case in *Warren Trading Post*. It appears from Wheeler's affidavit that he leased two one-acre tracts of tribal trust land from the plaintiff Tribes, with the approval of the Bureau of Indian Affairs. He has used the tracts for "establishing two retail store trailers". Both stores are located on U.S. Highway 93. He claims that "every day [his] stores are closed" he misses sales and that the total profit he is "losing far exceeds $10,000". Two of the affidavits refer to the signs on the stores—"Cigarettes for Sale—$2.99 a Carton".

It is clear that the collection of the tax by the Indian seller would impose no tax burden on the Indians residing on the Reservation; nor would it infringe in any way upon tribal self-government. It may reasonably be inferred that the stores were not established primarily for the benefit of Indian customers residing on the Reservation, but rather to sell cigarettes to prospective customers passing on the highway and others who come from neighboring communities to purchase cigarettes at a price substantially lower than the going price off the Reservation. The Indian seller profits from increased sales. The non-Indian purchasers avoid the payment of a tax legally imposed upon them.

We conclude that under these facts the Indian seller in selling cigarettes to non-Indians is involved with non-Indians to a degree which would permit the State of Montana to require precollection of the tax imposed upon the non-Indians.

We are not persuaded by plaintiffs' argument that defendants have a remedy through enforcement against a non-Indian who may purchase or be in possession of cigarettes without the required stamp showing payment of the tax. We agree with defendants that this remedy would be costly and ineffective. More important, it would mean that the Indian seller of the cigarettes could aid and encourage non-Indians in disobeying the law and be immune from prosecution.

21. In pointing out "certain considerations that may be of assistance to the Court", the brief said in part:

"a. Ordinarily Indian traders are not required to distinguish between sales to Indians and sales to non-Indians. The trading posts are in Indian country and are under federal supervision as to all sales. It would be an unwarranted administrative burden to require them to operate under a dual system of licensing and sales. Here the factual situation is peculiar because appellant's sales to non-Indians are a major part of his activity. And, apparently, a major part of those sales are of cigarettes—a product in no way connected with reservation production or manufacture."

Defendants seek a clarification of the term "Non-Indian", contending that with respect to the sale of cigarettes on the Flathead Reservation anyone who is not an enrolled member of the plaintiff Tribes is a non-Indian. We do not agree. The cases and texts discussed *supra* refer generally to reservation Indians or Indians residing on the reservation. We conclude that all Indians residing on the Flathead Reservation are exempt from the payment of the cigarette tax.[22]

While the Department of Revenue of the State of Montana has filed no responsive pleading, as noted *supra* the Attorney General of Montana and the Department have filed a supplemental memorandum on behalf of the Department as well as the defendant Moe. The memorandum does not dispute any of the facts herein set forth. The defendants reserve their right to appeal from the ruling that this court has jurisdiction; and the memorandum discusses only the question of whether "the Montana cigarette excise tax is valid with respect to the sale of cigarettes on the Flathead Reservation by a member of the tribe to a non-Indian".

The motion of the plaintiffs for summary judgment is granted to the extent that the court holds as a matter of law that (1) the cigarette excise tax imposed by the State of Montana is invalid with respect to the sale of cigarettes by a member of plaintiff Tribes on the Flathead Reservation to any Indian residing on the Reservation; and (2) the cigarette dealer's license tax imposed by the State of Montana is invalid with respect to a member of plaintiff Tribes

selling cigarettes on the Reservation. In all other respects the motion is denied.

Plaintiffs will prepare, serve and lodge proposed judgment consistent with this order and opinion.

## SUPPLEMENTAL ORDER AND OPINION

Before BROWNING, Circuit Judge, and SMITH and JAMESON, District Judges.

### PER CURIAM:

By order entered May 10, 1974 this court, with Judge Smith dissenting in part, granted in part and denied in part the plaintiffs' motion for summary judgment. By order entered July 15, 1974 the case was "reopened for the development of additional facts and submission of additional briefs".[1]

Subsequent to the reopening of the case, an answer and motion for summary judgment were filed by the defendants Department of Revenue, State of Montana, and W. A. Groff, Acting Director of the Department. Through extensive discovery, consisting of affidavits, interrogatories, and requests for admissions, the parties have developed more detailed facts with respect to the history and present status of the state-tribal relationship, and particularly the expenditures of funds by the Federal Government and State of Montana and local governments for various services on the Flathead Reservation. The facts upon which the respective parties rely may be summarized as follows:

The Flathead Indian Reservation, created by the Treaty of Hellgate of

---

22. We decline to rule on the application of the tax in sales to Indians who do not reside on the Flathead Reservation. The courts have recognized that different rules may apply "where Indians have left the reservation and become assimilated into the general community". *McClanahan, supra* at 171. Different factual situations might well be presented in attempting to define "Indians" and "non-Indians" with respect to sales to non-residents of the Reservation. The

record before the court on the present motions does not permit this determination.

1. The court recognized in the order that this is a test case, that the dissenting opinion raised questions which were not considered or briefed by counsel, and that both parties "should be given an opportunity to develop any additional facts relevant to any issue which may be raised on appeal".

1855 (12 Stat. 975), consists of approximately 1,245,000 acres, of which approximately 628,642 acres are owned in fee,[2] 614,311 acres in trust either for the plaintiff Tribes (564,320 acres) or individual Indians (49,991 acres), and 1,017 acres by the United States. The Reservation is part of four Montana counties—Lake, Sanders, Missoula and Flathead.[3]

The current enrolled membership of the Plaintiff Tribes is 5,749.[4] 2,911 members reside on the reservation, of whom 2,677 live in Lake County; 744 members reside in Montana off the reservation; and 2,034 members reside outside the State of Montana. Tribal members comprise 19% of the total reservation population.

The Flathead Reservation is a well-developed agricultural area with farms, ranches and communities scattered throughout the inhabited portions of the Reservation. While some towns have predominantly Indian sectors, generally Indians and non-Indians live together in integrated communities. Banks, businesses and professions on the Reservation provide services to Indians and non-Indians alike.

As Montana citizens, members of the Tribe are eligible to vote and do vote in city, county and state elections. Some hold elective and appointed state and local offices. All services provided by the state and local governments are equally available to Indians and non-Indians.[5] The only schools on the Reservation are those operated by school districts of the State of Montana. The State and local governments have built and maintain a system of state highways, county roads and streets on the Reservation which are used by Indians and non-Indians without restriction.

The Montana cigarette tax is 12 cents on each package sold within the state. 4.5 cents of the tax is allocated by state law to the state's general fund. The general fund is used for the support of state government, including the state institutions and the state educational system,[6] all of which provide service to Indians and non-Indians alike. The cigarette tax loss to the State of Montana resulting from the sale of cigarettes on the Flathead Reservation for the years 1972, 1973 and the first half of 1974 exceeded the sum of $591,000.

All of the "smoke shops" on the Reservation are on land held by the United States in trust for the Plaintiff Tribes. The land is leased from the Tribes upon the Tribal Council's approval of the lessee's plan to erect a smoke shop. The Council controls the purchase of cigarettes for resale by Tribal members and charges an administrative fee in connection therewith. Although the Tribes are authorized by their constitution to tax, the Tribes have not imposed any tax on the cigarettes sold in the smoke shops.

2. From affidavit of Secretary of the Tribe. Some of the fee land is owned by Indians and some by non-Indians. 60,843 acres were granted to the State of Montana for school purposes.

3. 651,618 acres are in Lake County, 460,835 in Sanders County, 104,422 in Missoula County and 27,094 in Flathead County.

4. 166 are full blooded Indians; 1,496 from one-half to full blood; 2,372 one-half to one-quarter; 975 one-quarter to one-eighth; and 581 one-eighth to one-sixteenth degree Indians.

5. Among the services provided are sanitary sewage and solid waste disposal facilities and public water systems. Members of the Tribes receive aid to dependent children (75% of which is paid by the Federal Government) and welfare benefits from the State of Montana. They participate in social and rehabilitation services in various state institutions. Eligible members receive veteran bonuses paid by the State with revenue derived from cigarette taxes.

6. Members of Plaintiff Tribes have also participated with other Indians in fee waivers granted by the University of Montana, totaling $130,000 in 1973–74. During the same period the Bureau of Indian Affairs granted scholarships totaling $82,150.00 to 83 enrolled members of the Plaintiff Tribes for study at Montana universities and colleges.

As set forth in our order of May 10, 1974, it was recognized in McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 173 n. 12, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), that while the State of Arizona expended tax moneys for education and welfare within the confines of the Navajo Reservation, the Federal Government likewise made substantial payments for various purposes. We stated that the same was true with respect to the Flathead Reservation in Montana. The facts developed in the discovery subsequent to our order confirm this conclusion.

It appears from the affidavit of the Secretary of the Interior that for the fiscal year 1974 the Federal Government expended $6,436,614.53 in connection with the supervision of the affairs of Indians on the Reservation, comprising the following:

| | |
|---|---|
| Bureau of Indian Affairs Flathead Agency | $2,188,529.53 |
| Indian Public Health Service (HEW) | 1,722,997.00 |
| Kicking Horse Manpower Development Center Tribal Contract—Department of Labor | 1,362,850.00 |
| CAP, Tribal Community Action Program | 169,000.00 [7] |
| Manpower Programs | 280,180.00 |
| EDA (Economic Development Administration) | 391,298.00 [8] |
| HEW—874 Funding Assistance to Public Schools | 321,760.00 [9] |
| | $6,436,614.53 |

The expenditures included programs in education, social services, housing im-provement, employment assistance, adult vocational training, law and order, forestry, range management, reservation programs, soil and moisture conservation, road construction and maintenance, real property management, general trustee services, and Indian business development.

The Tribes expended tribal funds of $5,398,792.86 during fiscal year 1974 as follows:

| | |
|---|---|
| Tribal Budget | $4,365,887.00 [10] |
| Federal Contracts, etc. | 390,178.38 |
| Credit Enterprise | 66,868.79 |
| Hot Springs Enterprise | 30,742.29 |
| Forest Management Enterprise | 545,116.40 |
| Total | $5,398,792.86 |

These funds were derived from moneys earned by the Tribes through sale and lease of tribal property and operating tribal enterprises.

In spite of the extensive discovery, it is impossible to compare with precision the expenditures by the Federal Government for the Indians living on the Reservation with the amounts spent by the state and local governments. To a large extent the expenditures relate to different services. As a result, we are unable to determine with exactitude the net effect of the loss of tax revenues to the state and local governments because of the unique status of the Reservation and the Indians living thereon. It is clear, however, that (a) the amount contributed by the Federal Government is substantial; (b) the funds expended by

7. This is the only Community Action Program on the Reservation and serves both Indians and non-Indians.

8. Apparently the Tribally sponsored Economic Development Program was instrumental in obtaining grants for water and sewer systems in the Reservation towns of Dixon and Pablo.

9. The Government's payment for public school assistance, pursuant to P.L. 874, while substantial, is not proportionate to the amounts contributed by the state, counties and school districts, considering the number of Tribal members enrolled in the public schools. For example, during the academic year 1972–1973, Tribal members accounted for approximately 27% of the student body enrollment in the public schools located on the Reservation. During that period, the state, school districts and counties contributed funds totalling $3,-738,684.00 while the Government under P.L. 874 contributed $356,735.00, or about 9% of the total. It is important to note, however, that this comparison does not take into account the real property taxes paid by Tribal members which are used in part to support the state educational system.

10. Plaintiff Tribes provide law and order, including a court system. They also provide other community services, including health care, special assistance (burials, fires, welfare), employment assistance, housing, tribal projects (support of Indian community events) and administration of programs unique to tribal government.

both the Federal Government and Tribes contribute to the economic wellbeing of the Reservation, (c) non-Indians benefit from at least part of the expenditures; and (d) funds are expended for many programs unique to tribal government.

Defendants contend that the Tribal members living on the Flathead Reservation are now so completely integrated with the non-Indians, sharing in all of the services furnished by the state and local governments, that there is no longer any reason to accord them different treatment than other citizens. Defendants argue in their supplemental memorandum:

"The rationale of treating Indians differently from non-Indians starting with Worchester v. Georgia, 6 Pet. 515 [8 L.Ed. 483] (1832) arose out of another age and another time. Indians, like many, many other minority groups were not then citizens and were not members of society in the usual sense. That situation no longer prevails. The Plaintiff members are citizens of the United States and Montana and enjoy all of the benefits of citizenship. They are a part of this society and participate fully in it."

 It is true that conditions have changed on all Indian reservations since the treaties were negotiated with the various tribes.[11] As noted in our order of May 10, 1974, this was recognized in *McClanahan, supra* at 173, n. 12, 93 S.Ct. at 1263, but the Court concluded that it was "still true, as it was in the last century" that the relationship of the Indian tribes is "an anomalous one and of a complex character" and that conferring "rights and privileges on these Indians cannot affect their situation, which can only be changed by

treaty stipulation, or a voluntary abandonment of their tribal organization".[12] Plaintiff Tribes have not abandoned their tribal organization. Any changes in the rights and privileges they have enjoyed under the Treaty of 1855 must be made by treaty stipulation or by Act of Congress.

 Nor can we accept defendants' contention that treatment of Indians on the Flathead Reservation for tax purposes differently from other citizens "is repugnant to the fundamental principles of due process and equal protection". The exemption of Indians from the state cigarette tax and other taxes is not based on race. Rather, relevant treaties and federal statutes serve as the basis for the distinction between reservation Indians and all others in the imposition of state taxes. The entire history of Indian law attests to that fact.

In the recent case of Morton v. Mancari, 417 U.S. 535,[13] 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the Court reviewed various statutes and decisions according special treatment to Indian tribes and reservations, saying in part:

"Literally every piece of legislation dealing with Indian tribes and reservations, and certainly all legislation dealing with the BIA, single out for special treatment a constituency of tribal Indians living on or near reservations. If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized." At 2483–2484.

. . . . . .

"On numerous occasions this Court specifically has upheld legislation that

---

11. It may be assumed also that integration on the Flathead Reservation is more complete than on most reservations.

12. Quoting from The Kansas Indians, 5 Wall. 737, 757, 18 L.Ed. 667 (1867).

13. In Morton v. Mancari, the Court held that preferential employment of Indians by the Bureau of Indian Affairs did not constitute "racial discrimination in violation of the Due Process Clause of the Fifth Amendment".

singles out Indians for particular and special treatment. See, e. g., Board of County Comm'rs v. Seber, 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094 (1943) (federally granted tax immunity); McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) (same); . . . This unique legal status is of long standing, see Cherokee Nation v. Georgia, 5 Pet. 1, 8 L.Ed. 25 (1831); Worcester v. Georgia, 6 Pet. 515, 8 L.Ed. 483 (1832), and its sources are diverse . . . As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." At 2485.

■ Finally we are unable to agree with plaintiffs' contention that Tribal members who received fee patents under the terms of the General Allotment Act of 1887 and who continue to reside on the Reservation are subject to all of the tax laws of the State of Montana.[14] The General Allotment Act provided in pertinent part:

"At the expiration of the trust period, and when the lands have been conveyed to the Indians by patent in fee, as provided in section 348 of this title then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law . . . .".

■ As the Supreme Court noted in Mattz v. Arnett, 412 U.S. 481, 496, 93 S.Ct. 2245, 2253, 37 L.Ed.2d 92 (1973), when the Allotment Act of 1887 was enacted, "Its policy was to continue the reservation system and the trust status of Indian lands, but to allot tracts to individual Indians for agriculture and grazing. When all the lands had been allotted and the trust expired, the reservation could be abolished". In a footnote the Court continued: "The policy of allotment and sale of surplus reservation land was repudiated in 1934 by the Indian Reorganization Act, 48 Stat. 984, now amended and codified as 25 U.S.C. § 461 et seq." The Court found the Allotment Act of 1892, which did not "differ materially" from the Act of 1887, "completely consistent with continued reservation status". See also Seymour v. Superintendent, 368 U.S. 351, 356–358, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962).[15]

Counsel have not cited, nor have we found, any case recognizing a distinction between reservation Indians who hold fee patents as a result of the Al-

---

14. Presumably some of the allottees who received fee patents still own the patented land and reside on the Reservation. In other cases, allottees have conveyed to other persons, both Indians and non-Indians, or the land is held by heirs or devisees of the original allottees.

15. The Solicitor of the Department of the Interior has described the grant of state jurisdiction in Section 349 as follows:
"Such complexities and distinctions as these have rendered the grant of State jurisdiction over Indians contemplated by the General Allotment Act largely ineffective. The sponsors of that legislation assumed that the allotment to the Indians in severalty would be but the prelude to the termination of their tribal relations and the liquidation of Federal supervision over them. When that program failed to be carried out, and the Indians, despite the fact that they are now citizens, continued to maintain their tribal relations and the Government continued its guardianship over them, the subjection of the Indians to the jurisdiction of the States ceased to have much reality. State law-enforcement officers could not, after all, go around with tract books in their pockets, and being unable to distinguish a patent-in-fee Indian from a ward Indian, they did not commonly concern themselves with law violations by Indians, and the theoretical jurisdiction of the States thus fell into innocuous desuetude. Thus, when it has been desired to confer on particular States criminal or civil jurisdiction over Indians, it has been accomplished by general statutes conferring such jurisdiction, irrespective of the tenure by which Indians held their lands." Opinion M–36184, February 15, 1954, 61 I.D. 298, 304.

lotment Acts and other reservation Indians with respect to their status and privileges as reservation Indians.

■ We adhere to the conclusion set forth in our orders of October 10, 1973 and May 10, 1974 that Montana may not impose its cigarette tax upon sales of cigarettes on the Flathead Reservation between members of the Tribes; nor may Montana require a member of the Tribes who sells cigarettes on the Flathead Reservation to possess its cigarette dealer's license.

■ We adhere also to our conclusion in the May 10, 1974 order that in selling cigarettes to non-Indians the Indian seller is involved with non-Indians to a degree which permits the State of Montana to require precollection of the tax imposed upon the non-Indian. The reasons for this conclusion are set forth in the May 10, 1974 order.

In our May 10 order we noted that the United States Supreme Court had remanded Tonasket v. Washington, 411 U.S. 451, 93 S.Ct. 1941, 36 L.Ed.2d 385 (1973), to the Supreme Court of Washington for reconsideration in light of a Washington statute enacted in 1972 (§§ 6 and 7 of c. 157, 1972 Extraordinary Session Laws of the State of Washington) and the decision in *McClanahan*. In an opinion entered August 8, 1974 the Washington Court held that Public Law 83–280 permitted "extension of the state cigarette excise tax to Mr. Tonasket's retail sales to non-Indians" and found no mandate in *McClanahan* to preclude this conclusion. Tonasket v. State of Washington, 84 Wash.2d 164, 525 P.2d 744.

On the other hand, the Supreme Court of Idaho in Mahoney v. State of Idaho Tax Commission, 96 Idaho 59, 524 P.2d 187 (1974), cert. den., 419 U.S. 1089, 95 S.Ct. 679, 42 L.Ed.2d 681 (1974) held that "the Idaho State Tax Commission had no jurisdiction to tax the on-reservation sale of cigarettes by an Indian seller whether the purchasers were Indians or non-Indians", relying on the Commerce Clause, U.S.Const. Art. I, Sec. 8, Cl. 3. We are not persuaded that the reasoning in *Mahoney* should be followed under the statute and factual situation involved in this case.

■ Nor are we persuaded that the precollection of the tax imposed upon non-Indian consumers interferes with Tribal self-government, as Plaintiff Tribes contend. We have recognized that the tax is not applicable to Indian consumers residing on the Reservation. The fact that the Tribes collect a small rent and administration fee from operators of "smoke houses" does not justify sales to non-Indians without payment of the tax. These sales are not for the benefit of the Tribes, but rather for non-Indian consumers, who are obligated to pay the tax, and the two Indian sellers who have a competitive advantage in selling cigarettes to non-Indians without precollecting the tax.

The motion of the plaintiffs for summary judgment is granted to the extent that the court holds as a matter of law that (1) the cigarette excise tax imposed by the State of Montana is invalid with respect to the sale of cigarettes by a member of Plaintiff Tribes on the Flathead Reservation to any Indian residing on the Reservation; and (2) the cigarette dealer's license tax imposed by the State of Montana is invalid with respect to a member of Plaintiff Tribes selling cigarettes on the Reservation. In all other respects the motion of plaintiffs is denied and the motion of the defendants for summary judgment is granted.

Plaintiffs will prepare, serve and lodge proposed judgment consistent with this order and supplemental opinion.

RUSSELL E. SMITH, District Judge (dissenting):

I agree that this court has jurisdiction and I agree, although for reasons different from those expressed in the per curiam opinion, that cigarette sales to non-Indians should be taxed.

I dissent[1] from so much of the per curiam opinion as denies the State the power to tax all cigarette sales on the Flathead Reservation.

I am aware that the decision in McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), and the dictum in Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), cast grave doubt upon the position[2] I take but, even conceding the validity of *McClanahan*, I think it would be wrong to apply that decision to the Flathead Reservation and I believe that there are considerations here involved never discussed by the Supreme Court which are sufficient to justify a refusal to apply the rule of a Navajo case to the completely different Flathead Reservation.

The Flathead Reservation was created by the Treaty of 1855, 12 Stat. 975. The Act of April 23, 1904, 33 Stat. 302, provided for allotments in severalty to members of the tribe "under the provisions of the allotment laws of the United States" and for the sale of the surplus unalloted agricultural lands. President Taft on May 22, 1909, proclaimed that the surplus unallotted land should be opened for settlement under the Homestead Laws, and on May 24, 1909, the Secretary of the Interior promulgated regulations for the settlement of such lands. As a result of all of this lands were allotted to individual Indians in severalty and lands were sold to non-Indians under the Homestead Laws. Some of the lands allotted to individual Indians passed into non-Indian ownerships.

The reservation consists of approximately 1,250,000 acres, of which 615,618 acres is Indian trust land. Because the allotments in severalty were made of the agricultural land, the greater part of the trust land is in foothills and mountains. The total resident membership of the tribe is 19 percent of the population within the boundaries of the reservation. The racial mixture is as shown in note 4 of the supplemental per curiam.

Congress over the years provided for the establishment of the Flathead Irrigation Project. Acts of April 30, 1908, 35 Stat. 83; May 29, 1908, 35 Stat. 448; March 3, 1909, 35 Stat. 795; April 4, 1910, 36 Stat. 276; April 12, 1910, 36 Stat. 296; August 9, 1912, 37 Stat. 265; August 24, 1912, 37 Stat. 526; and May 18, 1916, 39 Stat. 138. The Act of May 10, 1926, 44 Stat. 464, provided that irrigation districts created and operated under the state law should be utilized for the collection of moneys needed for the operation and maintenance of the project and the repayment to the United States of funds advanced for the construction of the Flathead Irrigation Project. An elaborate irrigation system was built and extensive power projects established to provide power for pumping and for domestic and commercial use on Indian and non-Indian lands on the Flathead Reservation. The Flathead Reservation is now a well-developed agricultural area.

Indians and non-Indians are randomly scattered over the whole of the cultivated portion of the reservation. Towns and villages have developed, occupied by non-Indians and Indians alike. In the towns, banks, businesses, and professions provide services to the Indians and non-Indians. There are no licensed Indian traders on the Flathead Reservation.

As the non-Indian settlers moved in, school districts were created. From the beginning these districts, supported by state and local taxes with some federal help, operated integrated schools. Now a system of state highways and county roads, built and maintained by federal, state, and county moneys, serve the urban and rural residents of the reservation. Indians do vote and are eligible to and do participate fully in the state government at all levels. Until the decision of the Supreme Court in Kennerly v. Dis-

---

1. The dissenting opinion filed May 10, 1974, is withdrawn and this opinion substituted.

2. *See* Mahoney v. State Tax Comm'n, 96 Idaho 59, 524 P.2d 187 (1974) cert. denied, 419 U.S. 1089, 95 S.Ct. 679, 42 L.Ed.2d 681.

trict Court, 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971), the civil law of Montana did (except in matters involving federal law) in fact form the basis of decision in cases arising on the reservation between Indians and Indians, Indians and whites, and whites and whites. Until recently Indians did pay state exise taxes and property taxes except on trust lands.

In 1935 the Tribe incorporated under the provisions of the Indian Reorganization Act, 25 U.S.C. § 461 et seq., 48 Stat. 984 (1934), and in 1965 accepted the criminal jurisdiction of the state, pursuant to Pub.L. No. 280, 67 Stat. 588 (1953), and R.C.M.1947 § 83–801 et seq. *See* State ex rel. McDonald v. District Court, 159 Mont. 156, 496 P.2d 78 (1972). The jurisdiction of minor crimes is concurrently shared by the state and tribal courts. The case of Kennerly v. District Court, *supra,* does deprive the Indian of the right to the use of the state courts in civil disputes with other Indians, but the State of Montana and the Counties of Lake, Sanders, and Flathead, except as limited by the decision in *Kennerly,* offer to Indians and the Indians do use a full measure of state and local government services.

In 1887 Congress enacted the General Allotment Act. 25 U.S.C. § 349, 24 Stat. 390. Section 6 of that Act provided:

At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, as provided in section 348 of this title, then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law . . . .

Had the provisions of the General Allotment Act continued to operate, the problems we face here would not have arisen. Patents would have issued and ultimately the state civil law would have been applicable to all.[3]

The Indian Reorganization Act, 25 U. S.C. § 461 et seq., 48 Stat. 984 (1934), although it did not repeal the General Allotment Act, did, by stopping the flow of patents under it, make its citizenship and state laws provisions inoperative.

In light of this history I turn to the problem of jurisdiction,[4] and as a prelude to that I examine the relationship of the Indian to the State.

No case that I have seen considers the effect of the Act of June 2, 1924, 43 Stat. 253, conferring citizenship upon Indians regardless of the status of their land patents. When Congress made Indians citizens of the United States, it made them citizens of the states in which they reside.[5] By virtue of the 15th Amend-

3. I do not agree with the position taken in the majority opinion as to the status of the Indians who received fee patents. They were, as individuals, even though within the exterior boundaries of the reservation, made subject to state law by the language of the General Allotment Act. Nothing has ever changed that. No doubt, as said in Mattz v. Arnett, 412 U.S. 481, 496 n. 18, 93 S.Ct. 2245, 2254, 37 L.Ed.2d 92 (1973), "[t]he policy of allotment and sale of surplus reservation land was repudiated in 1934 by the Indian Reorganization Act, 48 Stat. 984 . . . ." but that Act did not purport to affect the status of the individual Indians.

4. If the term "jurisdiction" denotes the power of a sovereign to impose its laws upon persons and relationships and a lack of jurisdiction denotes the incapacity of that sov-

ereign to affect persons and their relationships by its laws, then I assume that a lack of jurisdiction extends not only to taxes but to other relationships as well. If this is so, then this case and others may well be placing in limbo all sorts of legal relationships. The reservation Indian employed in a sawmill may well have cause to be concerned about his status under the Workman's Compensation Laws of Montana. Is he covered if employed on the reservation by a reservation Indian?—a non-reservation Indian?—a white? If he is not covered, then where does he find his common law remedies?

5. "An Indian, becoming a citizen of the United States and residing in a state, is held to be a citizen of that state. Boyd v. Nebraska, 143 U.S. 135–162, 12 S.Ct. 375, 36 L.Ed. 103. Matter of Heff, 197 U.S. 448

ment[6] it made them eligible to vote. I believe that it also placed them under the jurisdiction of the states to the extent necessary to qualify them for 14th amendment protection. I am unwilling to conclude that when Congress expressly granted citizenship to Indians it withheld from them the equal protection of state laws.[7]

If Congress did, by making Indians citizens of the states, vest them with rights under state law, did it at the same time protect them from any of the burdens of state citizenship? Did it give them the right to vote taxes without having to pay them, the right to hold state office without bearing some part of the burden of paying the salary of that office?[8] It has been the policy of Congress to equalize, without regard to race, the benefits and the burdens of government.

The Civil Rights Act of 1870, 42 U.S. C. § 1981, provides:

All persons within the jurisdiction of the United States shall have the the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, tax-

es, licenses, and exactions of every kind, and to no other.[9]

The policy of the Civil Rights Act of 1870 was expressly made applicable to some Indians by the General Allotment Act, 25 U.S.C. § 349, 24 Stat. 390 (1887), which has not been expressly repealed. That Act most unequivocally provided that when citizenship was achieved the Indian "shall have the benefit of and be subject to the laws, both civil and criminal, of the state." *See* Goudy v. Meath, 203 U.S. 146, 27 S.Ct. 48, 51 L.Ed. 130 (1906). By specific congressional mandate equal protection followed citizenship.

The Montana Enabling Act specifically indicated as to Indians that political rights and burdens are related, in this language:

. . . The constitutions shall be republican in form, and make no distinction in civil or political rights on account of race or color, except as to Indians not taxed . . . . Act of February 22, 1889, 25 Stat. 676

Only the taxed Indian was thought to have civil and political rights within the states.

I believe that we are faced with a choice of inferences. We may infer that Congress placed the Indians beyond the jurisdiction of the state to tax or that

---

(sic), 25 S.Ct. 506, 49 L.Ed. 848. The latter case was overruled by United States v. Nice, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192, but on another point." Deere v. New York, 22 F.2d 851, 852 (N.D.N.Y.1927). *See also* F. Cohen, Handbook of Federal Indian Law 156 (University of New Mexico Press, 1942).

6. *"Amendment* XV.—*Universal Male Suffrage* "Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude. "Section 2. The Congress shall have power to enforce this article by appropriate legislation."

7. We do not deal here with equal protection as it might affect the relationship between

the individual Indian and the tribe, nor as between the individual Indian and the United States. See note 12.

8. I recognize that it did do this in part by exempting Indian trust lands from taxation, but when we deal with the taxation of trust lands we deal not with implications but with exemptions repeatedly and expressly stated whenever Congress has acted and, at least in the case of the State of Montana, with exemptions stated in the Enabling Act.

9. It has been held that this section does not apply to Indians in their relationship to the tribe. Spotted Eagle v. Blackfeet Tribe, 301 F.Supp. 85 (D.Mont.1969). The effect of 42 U.S.C. § 1981 has not been considered as to the Indians in relationship to the state.

it did not.[10] But as I see it, the exercise of a federal power in such a way as to at the same time extend to Indians all state rights and withhold from them all state burdens poses some constitutional problems. Were non-Japanese residents of a state forced to pay taxes to provide state services for the Japanese residents, who were exempt from taxation solely because of their race, then the non-Japanese would be bearing an unequal burden. Were Congress by statute to direct a state to exempt all Japanese from state taxation I think that Congress would be requiring the state to violate the equal protection concept embraced in the fifth amendment.[11] Although a taxing authority has an almost unlimited power to classify, I apprehend that race alone would never be a valid basis for classification.

The Japanese is, of course, entitled to a full measure of state services by virtue of the 14th amendment The analogy to the Japanese fails if the Flathead Indian is not entitled to state services— if the State of Montana can refuse to admit Indian children to its schools, Indian young people to its colleges, and refuse to extend welfare benefits to the Indian poor and aged. In that event no unequal burden is placed upon the non-Indian and the equal protection problem disappears.

If, as I view it, the Flathead Indian is entitled to a full measure of Montana state and local government services, then I think the federal government may not, without invading the constitutional rights of non-Indian taxpayers, exempt Indians from the burdens of state taxation except to the extent that the people of the state accepted the congressional exemption stated in the Enabling Act. Stated differently, Congress has the power to require that Indians be not deprived of the equal protection of state laws, and it has the power to exempt the Indian from state taxation, but in my opinion the exercise of both of these powers at the same time would deprive non-Indians of equal protection.[12] If that is so, then I cannot infer the exercise of both powers and, given a choice of inference, I would, for the reasons stated, infer that the Flathead Indians are sufficiently within the jurisdiction of the State of Montana to be entitled to state services and, except as to trust lands, subject to state taxation.

Other considerations tend, in my opinion, to confirm this view. Congress is aware of state taxation and has in specific instances found plain language to express various Indian exemptions

---

10. Again we are not here concerned with the power of Congress to tax and spend in the discharge of what Congress deems to be the federal obligation to Indians.

11. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

12. I do not regard Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), as contrary. That case involved the Indian in relationship to the federal government and not the Indian in relationship to the state. Even with respect to the federal government the opinion is carefully limited to the problem of preferential employment in the Bureau of Indian Affairs, which was related to "Indian self-government." Perhaps it can be said that granting Indians an exemp-

tion from cigarette taxation "is reasonable and rationally designed to further Indian self-government," but I don't think so.

Where unequal rights are enjoyed by the Indian because "the unique legal status of Indian tribes under federal law and upon the plenary power of Congress, based on a history of treaties and the assumption of a 'guardian-ward' status, to legislate on behalf of federally-recognized Indian tribes," (at 551, 94 S.Ct. at 2483) then it would seem that the inequality could be justified only in terms of that relationship. If the guardian requires that the ward be the beneficiary of the state's services and the ward accepts those services, then the new relationship of the ward is out of the orbit of federal management and the inequality should not persist as to the new relationship.

from various state taxes.[13] Congress has been extremely careful to specifically exempt from state taxation Indian trust lands. The exemption appears in the Montana Enabling Act which speaks of lands and *only* lands in terms of both federal jurisdiction and federal control,[14] and specifically in terms of taxation:

> . . . But nothing herein, or in the ordinances herein provided for, shall preclude the said states from taxing as other lands are taxed any lands owned or held by any Indian who has severed his tribal relations, and has obtained from the United States or from any person a title thereto by patent or other grant, save and except such lands as have been or may be granted to any Indian or Indians under any act of congress, containing a provision exempting the lands thus granted from taxation; but said ordinances shall provide that all such lands shall be exempt from taxation by said states so long and to such extent as such acts of congress may prescribe. R.C.M.1947, Vol. 1, p. 69

The fact that Congress expressly prohibited the states from taxing lands exempt by federal law is pregnant with the thought that Congress did think that, absent federal restriction, Indian property might be taxed.

The Supreme Court in McClanahan v. Arizona State Tax Comm'n, *supra,* 411 U.S. at 176, 93 S.Ct. at 1264, has said that the language of the Buck Act (4 U.S.C. § 109, 54 Stat. 1059 (1971)): " '[n]othing in sections 105 and 106 of this title shall be deemed to authorize the levy or collection of any tax on or from any Indian *not otherwise taxed* . . .' " (emphasis supplied) clearly expresses a congressional intent to maintain the tax-exempt status of Indians. With all deference I read Section 109 differently. Had the section ended with the word "Indian," then I would find a purpose to exempt Indians or preserve an exempt status. But is seems to me that by adding the words "not otherwise taxed" Congress specifically recognized the possibility that Indians might be subject to state sales and income taxes. The Buck Act as respects taxation maintained the status quo as to reservation Indians and nothing more.

The Act of Congress (25 U.S.C. §§ 1321–1326) providing a method whereby the states may assume jurisdiction over Indian tribes is cited in *McClanahan.* However, the concern of Congress was, as is evident from the language of the Act, with state court assumption of and with the jurisdiction of state courts to try civil and criminal cases. Where the Act speaks of taxes it makes its purpose unmistakably clear:

> Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States . . . 25 U.S.C. § 1321(b)

Identical language is repeated in 25 U.S.C. § 1322(b). This language confirms my thought that when Congress wanted to exempt something from state taxation it had no difficulty finding words to express that intention. I believe that these sections indicate that Congress intended to exempt from state taxation that which

---

13. See 25 U.S.C. §§: 564, 749, 798, 853, 898, 937, 955, and 963, and 25 U.S.C.A. (pocket part) §§: 565f, 589, 594, 609b–1, 610b, 645, 648, 662, 676b–1, 690, 788b, 881, 883c, 967c, 1013, 1036, 1073, 1087, 1104, 1120, 1134, 1146, 1154, 1165, 1171, 1185, 1194, 1204, 1211, 1225, 1234, 1246, 1252 (Flathead), 1264, 1273, 1282, 1296, 1300a–3, 1300b–4, 1300c–4, 1300d–8, and 1300e–6.

14. In Organized Village of Kake v. Egan, 369 U.S. 60, 69, 82 S.Ct. 562, 567, 7 L.Ed.2d 573 (1962), the Court said of this language: "The disclaimer of right and title by the State was a disclaimer of proprietary rather than governmental interest."

it had carefully spelled out in so many other statutes and what it then believed to be exempt, i. e., trust property and trust property alone.

The Indian Reorganization Act of 1934 (Wheeler-Howard Act, 25 U.S.C. § 461 et seq.) does not, as I see it, cast any light upon the problems of state taxation of the individual Indian except that it, too, shows that Congress knows how to express explicit exemptions when it wants to. It is probable that Congress did not realize that by halting the allotment of Indian lands and then making the provisions of the General Allotment Act ineffective, it was creating problems. It is likely that had Congress seen the problem (i. e., was there to be a difference between the Indians who in 1934 had received fee patents and were subject to state law, and a new generation of Indians who would not receive patents and who were, therefore, not automatically made subject to state law by the General Allotment Act?) it would have done something about it one way or the other. I doubt that any worthwhile inferences are to be drawn from the Wheeler-Howard Act.

It appears to me that there is something fundamental in the idea that the rights of citizenship carry the burdens of citizenship and that no inquiry into the duty of an individual to pay taxes is complete without an inquiry into the citizenship of that individual. (We are concerned with individuals, not tribes.) I would infer that citizenship carries with it the burden of citizenship and absent any clear language to the contrary I would find that to be the congressional intent. I do not, in the history and circumstances of the Flathead Indians, find that contrary language.

If the result in McClanahan were based on implication of tax exemption rather than on a lack of jurisdiction I would have no difficulty in distinguishing it from the case at bar and would find no tax exemptions on the Flathead Reservation except as to trust lands.

The rule that tax exemptions are not to be granted by implication applies to Indians. Oklahoma Tax Comm'n v. United States, 319 U.S. 598, 63 S.Ct. 1284, 87 L.Ed. 1612 (1943); Mescalero Apache Tribes v. Jones, *supra*.[15]

The Flathead Reservation and the Navajo Reservation are not now the same and do not have the same history. Different facts justify different results, even where the subject matter is Indians or Indian reservations.[16] Allotments in

15. "This Court has repeatedly said that tax exemptions are not granted by implication. United States Trust Co. v. Helvering, 307 U.S. 57, 60, 59 S.Ct. 692, 693, 83 L.Ed. 1104. It has applied that rule to taxing acts affecting Indians as to all others. As was said of an excise tax on tobacco produced by the Cherokee Indians in 1870, 'If the exemption had been intended, it would doubtless have been expressed.' Cherokee Tobacco, 11 Wall. 616, 620, 20 L.Ed. 227. In holding the income tax applicable to Indians, the Court said, 'The terms of the 1928 Revenue Act are very broad, and nothing there indicates that Indians are to be excepted. . . . If exemption exists it must derive plainly from agreements with the Creeks or some Act of Congress dealing with their affairs.' Superintendent v. Commissioner, *supra*, 295 U.S. 420, 55 S.Ct. 821, 79 L.Ed. 1517. If Congress intends to prevent the State of Oklahoma from levying a general nondiscriminatory estate tax applying alike to all its citizens, it should say so in plain words. Such a conclusion cannot rest on dubious inferences." Oklahoma Tax Comm'n v. United States, *supra*, 606–607, 63 S.Ct. at 1288. Squire v. Capoeman, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956), may point to, although it does not express, a different rule where the taxing power of Congress comes into conflict with the interest of a ward of the United States.

16. "The underlying principles on which these decisions are based do not fit the situation of the Oklahoma Indians. Although there are remnants of the form of tribal sovereignty, these Indians have no effective tribal autonomy as in Worcester v. Georgia, *supra*; and, unlike the Indians involved in *The Kansas Indians* case, *supra*, they are actually citizens of the State with little to distinguish them from all other citizens except for their limited property restrictions and their tax exemptions." Oklahoma Tax Comm'n v. United States, *supra*, 319 U.S. at 603, 63 S.Ct. at 1286.

severalty were not made on the Navajo Reservation and the provisions of the General Allotment Act never applied to the Indians on that reservation. There are no non-Indian ownerships within the exterior boundaries of the Navajo Reservation. The Navajos live to themselves—largely apart from the non-Indian community. The non-Indians on the reservation, such as Indian traders and government officials, are the invitees of the tribe or the federal government. What was said in Warren Trading Post Co. v. Arizona Tax Comm'n, 380 U.S. 685, 690, 85 S.Ct. 1242, 1245, 14 L.Ed.2d 165 (1965):

> Congress has, since the creation of the Navajo Reservation nearly a century ago, left the Indians on it largely free to run the reservation and its affairs without state control, a policy which has automatically relieved Arizona of all burdens for carrying on those same responsibilities. And in compliance with its treaty obligations the Federal Government has provided for roads, education and other services needed by the Indians . . .

and further at 691, 85 S.Ct. at 1246:

> . . . And since federal legislation has left the State with no duties or responsibilities respecting the reservation Indians, we cannot believe that Congress intended to leave to the State the privilege of levying this tax . . .

cannot be said of the Flathead Reservation.

The language in McClanahan v. Arizona Tax Comm'n, *supra,* 411 U.S. 173, 93 S.Ct. 1263:

> . . . When the relevant treaty and statutes are read with this tradition of sovereignty in mind, we think it clear that Arizona has exceeded its

lawful authority by attempting to tax appellant . . .

could not be applied to the Flathead Reservation. There was no tradition of sovereignty on that reservation until 1934. Major crimes were punished at the federal level and until at least 1935 minor crimes at the state level. There were no tribal courts until after the enactment of the Indian Reorganization Act in 1934. State courts did exercise jurisdiction over civil cases until the decision in Kennerly v. District Court, *supra.* The whole body of state civil law was thought to be applicable to non-Indians and Indians alike. Except as to trust lands Indians paid taxes as did others. The state irrigation district laws were specifically utilized in connection with the irrigation of reservation lands.

What was further said in *McClanahan* at 175, 93 S.Ct. at 1264:

> Moreover, since the signing of the Navajo treaty, Congress has consistently acted upon the assumption that the States lacked jurisdiction over Navajos living on the reservation . . .

cannot be said of the Flathead Reservation because at least until 1934 Indians were specifically made subject to state jurisdiction when they received fee patents, as many of them did, and if Congress assumed that state laws did not apply, its undisclosed assumption was not shared by the Indians or whites living on the reservation who never questioned the matter until the decision in Kennerly v. District Court, *supra.*

To paraphrase Mr. Justice Black in Oklahoma Tax Comm'n v. United States, *supra,* 319 U.S. at 603, 63 S.Ct. 1284, the underlying principles on which the Navajo decisions are based do not fit the situation of the Flathead Indians.